**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case 25-14814 |
| | ) | |
| Dennis Anthony Levy | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Hon. Deborah L. Thorne |
| | ) | |

## <u>NOTICE OF MOTION</u>

PLEASE TAKE NOTICE that on December 17, 2025 at 1:00 p.m., I will appear before the Honorable Deborah L. Thorne, or any judge sitting in her place, in courtroom 682 of the Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604 in-person or via zoom teleconference and present *Village Bank & Trust Company, N.A.'s and Wintrust Bank, N.A.'s Motion for Relief from Stay*, a copy of which is attached.

**All parties in interest may appear for the presentment of the motion electronically using Zoom for Government.**

You may appear electronically by video or by telephone.

**To appear by video**, use this link: https://www.zoomgov.com/. Then enter the meeting ID and passcode.

**To appear by telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID and passcode.

**Meeting ID and passcode.** The meeting ID for this hearing is **<u>160 9362 1728</u>**, and NO PASSCODE IS REQUIRED. The meeting ID and passcode can also be found on the judge's page on the court's web site.

**If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without calling it.

1

Dated: December 5, 2025                                    *Village Bank & Trust Company, N.A. and*
*Wintrust Bank, N.A.*

By: /s/ Scott H. Kenig
                      One of Its Attorneys

Scott H. Kenig (6198729)
Randall & Kenig LLP
455 N. Cityfront Plaza Drive
NBC Tower
Suite 2510
Chicago, Illinois 60611
Telephone:    312.822.0800
Facsimile:    312.822.0215
skenig@randall-law.com

## CERTIFICATE OF SERVICE

I, Scott H. Kenig, an attorney, certify that on December 5, 2025, I caused to be served a true copy of the *Notice of Motion* and *Village Bank & Trust Company, N.A.'s and Wintrust Bank, N.A.'s Motion for Relief from Stay* via (a) the Court's CM/ECF notification system, which delivers notice to the persons listed in the CM/ECF Service List below, and (b) upon the persons in the Mail Service List below by Regular, First Class United States Mail, postage fully pre-paid, addressed as stated in the list, and (c) upon the persons in the E-Mail Service List below by electronic mail as stated in the list.

### CM/ECF Service List

- Penelope Bach          pnbach@bachoffices.com
- Janice H Seyedin          jseyedin@kennovakinc.com
- Patrick S Layng          USTPRegion11.ES.ECF@usdoj.gov
- Steve Fritzshall          steve@go2court.com

### E-Mail Service List

City of Chicago,
Department of Revenue
PO Box 8292
Chicago, IL 60680-8292

US Bank
Attn Consumer
Bureau MGMT
Oshkosh, WI 54903

Department of the Treasury
Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101
sbse.cio.bnc.mail@irs.gov

Amex/Cbna
Correspondence/Bankruptcy
PO Box 981540
El Paso, TX 799986984
bncnotices@becket-lee.com

3

Amex/Cbna
PO Box 6789
Sioux Falls, SD 57117
Citi.BNC.Correspondence@citi.com

Email/PDF: Sep 30 2025 22:59:49
Bloomingdales/Citibank
PO Box 6789
Sioux Falls, SD 57117-6789
Citi.BNC.Correspondence@citi.com

Bloomingdales/Citibank
Attn: Bankruptcy
PO Box 8218
Mason, OH 45040-8218
Citi.BNC.Correspondence@citi.com

Cap1/neimn
PO Box 31293
Salt Lake City, UT 84131-0293
AIS.cocard.ebn@aisinfo.com

Cap1/neimn
Attn: Bankruptcy
PO Box 30285
Salt Lake City, UT 84130-0285
AIS.cocard.ebn@aisinfo.com

Capital One
Attn: Bankruptcy
PO Box 30285
Salt Lake City, UT 84130
AIS.cocard.ebn@aisinfo.com

Capital One
PO Box 31293
Salt Lake City, UT 84131-0293
AIS.cocard.ebn@aisinfo.com

Illinois Department of Revenue
P.O. Box 19035
Springfield, IL 62794
rev.bankruptcy@illinois.gov

Jpmcb Home
Attn: Legal Correspondence Center
700 Kansas Ln, Monroe, LA 71203-4774
ais.chase.ebn@aisinfo.com

Jpmcb Home
700 Kansas Ln
Monroe, LA 71203-4774
ais.chase.ebn@aisinfo.com

Macys/cbna
PO Box 6789
Sioux Falls, SD 57117-6789
Citi.BNC.Correspondence@citi.com

Macys/cbna
Attn: Bankruptcy
9111 Duke Blvd, Mason, OH 45040-8999
Citi.BNC.Correspondence@citi.com

Nordstrom/Td Bank USA
Attn: Bankruptcy
PO Box 6555
Englewood, CO 80155-6555
bnc@nordstrom.com

Nordstrom/Td Bank USA
13531 E Caley Ave
Englewood, CO 80111-6504
bnc@nordstrom.com

Syncb/Care Credit
Attn: Bankruptcy
PO Box 965060
Orlando, FL 32896-5060
ais.sync.ebn@aisinfo.com

Syncb/Care Credit
PO Box 71757
Philadelphia, PA 19176-1757
ais.sync.ebn@aisinfo.com

U.S. Small Business Administration
332 S. Michigan
Suite 600
Chicago, IL 60604
bankruptcynotices@sba.gov

**Mail Service List**

Internal Revenue Service
Mail Stop 5014CHI
230 S. Dearborn Street
Room 2600
Chicago, IL 60604-1705

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

/s/ Scott H. Kenig

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case 25-14814 |
| | ) | |
| Dennis Anthony Levy | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Hon. Deborah L. Thorne |
| | ) | |

## VILLAGE BANK & TRUST COMPANY, N.A.'S AND WINTRUST BANK, N.A.'S JOINT MOTION FOR RELIEF FROM STAY

Village Bank & Trust Company, N.A. ("**Village Bank**") and Wintrust Bank, N.A. ("**Wintrust Bank**"), secured creditors in the above-captioned Chapter 11 case, by and through their undersigned attorney, and pursuant to Section 362(d) of the United States Bankruptcy Code (11 U.S.C. §101 *et seq.*) (the "**Bankruptcy Code**") and Federal Rule of Bankruptcy Procedure 4001(a)(1), move this Court for the entry of an order granting them relief from the automatic stay with respect to the debtor's purported interest in and possession of the real property and improvements located at 709-711 W. Howard Street, Evanston, Illinois 60202 (the "**Real Property**") and debtor's interest in the furniture, fixtures and equipment (the "**Personal Property**") located at the Real Property in order to: (i) complete foreclosure of its mortgage interest in the Real Property; and (ii) complete foreclosure of its security interest in the Personal Property. In support thereof, Village Bank and Wintrust Bank state as follows:

## INTRODUCTION

1.      Dennis Anthony Levy (the "**Debtor**" or "**Dennis Levy**" as the case may be) has violated his loan agreements with Village Bank and Wintrust Bank and jeopardized Village Bank's senior secured interest in the Real Property and Village Bank's and Wintrust Bank's senior secured interest in the Personal Property as a result of his failure to pay the amounts due and owing under

various credit agreements, a fire at the Real Property on November 29, 2024 shutting down the Debtor's restaurant business and failing to pay the real estate taxes on the Real Property.[1] Village Bank and Wintrust Bank request relief from the stay to pursue *in rem*, non-bankruptcy remedies to protect its security interests in the Personal Property and Real Property including, but not limited to, completion of the pending foreclosure action against the Personal Property and Real Property and recovering possession of the Real Property currently occupied by the Debtor's closed business, Good to Go Jamaican Cuisine LLC ("**Good to Go**").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §157.  This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(A), (G) and (O).  Venue is proper in this Court pursuant to 28 U.S.C. §1409.

## LITIGATION BACKGROUND

3.      On November 12, 2024, Village Bank and Wintrust Bank filed a Complaint for Foreclosure and Other Relief in the Circuit Court of Cook County styled: Village Bank & Trust Company, N.A. and Wintrust Bank, N.A. *v. Good to Go Jamaican Cuisine LLC, et al.-24 CH 10122* (the "**Foreclosure Action**").  The Foreclosure Action relates to the Real Property and Personal Property.

4.      On April 28, 2025, a hearing in the Foreclosure Action was scheduled on Village Bank's motion to appoint a receiver.  The hearing on the motion to appoint a receiver did not occur because Good to Go filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (25-6446) on the morning of the hearing (that case was also assigned to this Court).  Village Bank

---

[1]      The property insurance for the Real Property was also cancelled on February 2, 2025.  Village Bank force-placed insurance on the Real Property on February 2, 2025.  On information and belief, the Debtor reinstated the property insurance for the Real Property effective May 14, 2025.

filed a motion for relief from the stay that was set for hearing on August 6, 2025. That lift stay motion was never heard because Good to Go voluntarily dismissed its bankruptcy case on July 16, 2025.

5.       As a result of the dismissal of the Good to Go bankruptcy, on September 26, 2025, another hearing in the Foreclosure Action was scheduled on Village Bank's motion to appoint a receiver. Again, the hearing on the motion to appoint a receiver did not occur because this time, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "**Petition**") on September 25, 2025, the day before the hearing.

6.       Village Bank and Wintrust Bank maintain that the Good to Go bankruptcy was not filed in good faith because Good to Go's sole scheduled asset was $529.00 consisting of cash on hand and scheduled liabilities of $2,869,372.11 and, therefore, Good to Go had no ability to confirm a plan. In addition, as discussed below, material misrepresentations were made by Good to Go at the 341 meeting regarding its intention to reopen the business at the Real Property. Village Bank also argued in its motion for stay relief that it was not adequately protected and Good to Go lacked any equity in the Personal Property.

7.       This case suffers from the same defects and Village Bank and Wintrust Bank would submit that it was filed for the sole reason to again thwart their efforts to have a receiver appointed in the Foreclosure Action.

## FACTUAL BACKGROUND

A.       **The Loans:**

(i)       **Loan #310002115-1**

8.       On November 1, 2023, Village Bank made a loan to the Debtor, Lenice Levy ("**Lenice**") and Good to Go in the original principal amount of $518,000.00, evidenced by a

promissory note dated November 1, 2023 ("**Note I**") executed by the Debtor, Lenice and Good to

Go in favor of Village Bank. The Debtor is the manager and sole owner of Good to Go and Lenice

is his wife. A copy of Note I is attached hereto as <u>Exhibit A</u>. Note I is secured by a mortgage (the

"**Mortgage**") and assignment of rents (the "**Assignment of Rents**") on the Real Property of even

date with Note I. Copies of the Mortgage and Assignment of Rents are attached hereto as <u>Exhibit</u>

<u>B</u> and <u>Exhibit C</u>, respectively.[2] Note I is also secured by a blanket lien on all of Good to Go's

Personal Property pursuant to that certain commercial security agreement (the "**Note I Security**

**Agreement**") dated November 1, 2023 executed by Good to Go and perfected by that certain UCC

financing statement filed with the Illinois Secretary of State on November 7, 2023 as Doc.

#30116089 (the "**Financing Statement**"). Copies of the Note I Security Agreement and Financing

Statement are attached hereto as <u>Exhibit D</u> and <u>Exhibit E</u>, respectively.

 **(ii)**  **Loan #310002116-3**

 9.  On November 1, 2023, Village Bank made a business loan to Good to Go in the

original principal amount of $75,000.00, evidenced by a promissory note dated November 1, 2023

("**Note II**") executed by Good to Go in favor of Village Bank. A copy of Note II is attached hereto

as <u>Exhibit F</u>. Note II is secured by a blanket lien on all of Good to Go's Personal Property pursuant

to that certain commercial security agreement (the "**Note II Security Agreement**") dated

November 1, 2023 executed by Good to Go and perfected by the Financing Statement. A copy of

the Note II Security Agreement is attached hereto as <u>Exhibit G</u>. Note II was guaranteed by the

Debtor pursuant to that commercial guaranty agreement of even date with Note II (the "**Note II**

---

[2] The Mortgage and Assignment of Rents were executed by the Debtor and Lenice as the owners of the Real Property. On February 28, 2024, the Debtor and Lenice, without Village Bank's consent and in violation of the terms of the Mortgage, conveyed the Real Property to DL YVEL Land Trust (the "**Trust**").

**Guaranty Agreement**").  A copy of the Note II Guaranty Agreement is attached hereto as <u>Exhibit H</u>.

   **(iii)    Loan #430004546-1**

10.     On January 5, 2024, Wintrust Bank made a business revolving line of credit loan to Good to Go in the original principal amount of $50,000.00, evidenced by that certain approval letter and revolving line of credit agreement dated January 5, 2024 ("**Note III**").  A copy of the approval letter and revolving line of credit agreement are attached hereto as <u>Group Exhibit I</u>.  Note III is secured by Good to Go's business assets pursuant to the terms and conditions of the approval letter and revolving line of credit agreement and perfected by that certain UCC financing statement filed with the Illinois Secretary of State on June 7, 2024 as Doc. #30773330 (the "**Note III Financing Statement**").  A copy of the Note III Financing Statement is attached hereto as <u>Exhibit J</u>.  Note III was guaranteed by the Debtor pursuant to that certain guaranty agreement of even date with the approval letter and revolving line of credit agreement (the "**Note II Guaranty**").  A copy of the Note III Guaranty is attached hereto as <u>Exhibit K</u>.  Note I, Note II and Note III are hereinafter collectively referred to as the "**Notes**."

**B.     The Defaults:**

11.     Note I and Note II are in default as a result of the borrowers' failure to pay the monthly installments due and owing under Note I and Note II.  Note III is in default as a result of the borrower's failure to pay the sums due and owing at maturity on December 15, 2024.  As a result of the foregoing defaults, all amounts due and owing under the Notes have been accelerated.  As of September 25, 2025, the following amounts were due and owing under the Notes:

**Loan #310002115-1 (Note I)**

Principal:              $511,282.47
Interest:                 36,335.40

11

Late Charges:              198.42
PO Processing Fee:         150.00
Prepayment Fee:         15,338.47
Real Estate appraisal:   2,000.00
Equipment appraisal:     1,650.00
Force-Placed insurance:  1,429.36
Legal Fees:             66,982.50
Real Estate Taxes:      33,040.76
Total:                $668,407.38

**Loan #310002116-3 (Note II)**

Principal:             $68,087.05
Interest:                8,266.37
Late Charges:             500.44
Legal Fees:               803.35
Total:                 $77,657.21

**Loan #430004546-1 (Note III)**

Principal:             $49,401.83
Interest:                3,893.79
Late Charges:             150.00
Annual Fee:                50.00
Total:                 $53,495.62

12.     In addition to the Debtor's failure to pay the monthly installments due and owing under the Notes, the real estate taxes for the Real Property were not paid.  In order to protect its collateral and avoid a sale of the real estate taxes, Village Bank has been forced to advance $33,040.76 for the delinquent real estate taxes which are the responsibility of the Debtor because the Petition indicates that the Debtor has the sole interest in the Real Property.

13.     In addition, the SBA has a junior mortgage against the Real Property in the amount of $430,902.54 according to Schedule D of the Petition and Willow Electric recorded a mechanic's lien against the Real Property on April 10, 2024 in the amount of $10,260.17 and has filed a counterclaim in the Foreclosure Action to foreclose its mechanic's lien

14.     The Debtor's business, Good to Go, also ceased operations at the Real Property as a result of a fire in November, 2024 which damaged the Personal Property that secures the Notes. Moreover, the insurance company that insured the Personal Property denied insurance coverage for the damage.  *See*, denial of coverage letter attached hereto as <u>Exhibit L</u>.

15.     By virtue of the Mortgage, Note I Security Agreement and Note II Security Agreement, Village Bank and Wintrust Bank hold secured liens in the Real Property and Personal Property that are senior and paramount to any other security interests in the Real Property and Personal Property.

<u>**PRELIMINARY STATEMENTS**</u>

16.     Before Village Bank and Wintrust Bank outline their request and bases for relief from the stay, it is important for this Court to understand the shell game being played by the Debtor and Good to Go vis-à-vis their respective bankruptcies and misstatements of fact made in connection with each bankruptcy case.

**A.      The Good to Go bankruptcy (25-6446):**

17.     The Good to Go bankruptcy case was based entirely upon the false premise that Good to Go intended to reopen its business once the fire damage was repaired.  However, during the 341 meeting, Good to Go, at best, misrepresented this intention and at worst, falsely testified.

**(i)      The 341 meeting[3]**

18.     On May 29, 2025, the United States Trustee (the "**UST**") conducted the 341 meeting.  At the 341 meeting, Good to Go was represented by Lenice even though Dennis Levy

---

[3]     Much of what follows comes from Village Bank's objection to Good to Go's motion to approve interim management agreement that was filed as Dkt. #35 in its bankruptcy case and is discussed in more detail below.

signed the Petition.  Lenice's testimony was equally notable for what she didn't say as well as what she did say.  During questioning from the UST, which lasted 36 minutes, Lenice never once told the UST that the sign on the Real Property identifying "Good to Go Jamaican Cuisine" had been removed or covered up by a new sign that read: "Jerk-Yard Bar and Grill coming soon."  A deliberate attempt to mislead the UST into believing that Good to Go intended to continue operating a restaurant at the Real Property.  This issue was not addressed until counsel for Village Bank began questioning Lenice.[4]  That line of questioning went as follows:

Q.    You indicated that you're going to open next week?

A.    Yes.

Q.    And that's the debtor that is going to reopen?

A.    Yes.

Q.    Good to Go Jamaican Cuisine?

A.    Yes, sir. Yes.

Q.    So I drove by there yesterday and there's a sign on the building that says "Jerk Yard Bar & Grill coming soon?

A.    Yes.  It's just a branding that we're doing just to give some newness, some vibrancy to the, you know, to the reopening of it . . . just some new energy.

Q.    So you're changing the name though?

A.    Yes.  Same operation.

Q.    But Good to Go Jamaican Cuisine used to be on the building.  It is not there anymore, is it?

A.    Not it's not.

---

[4]    There is an audio file available of the 341 meeting but no transcript.  Counsel for Village Bank obtained a copy of the audio file from the UST's office which can be provided to the Court upon request.

Q.      So you are going to be operating under this brand new name?

A.      Yeah. Like I said, it's a new marketing, branding strategy that we're using just to bring some . . . you know, extra attention to the, you know, the business.

Q.      Is the menu going to be the same?

A.      Oh Yeah. Yes. With some additional infusion that we're offering, but yes.

Q.      Is Jerk Yard Bar & Grill a new entity?

A.      We're doing just the d/b/a.

Q.      And whose is doing business as that?

A.      So we are operating and I have new managers that are also coming in so it's just like a new management team but Good to Go is the business that has the licensing and everything.

Q.      So you're saying it is going to be Good to Go Jamaican Cuisine d/b/a Jerk Yard Bar & Grill?

A.      Yes.

Every aspect of the foregoing testimony from Lenice, on behalf of Good to Go, is a clear statement that Good to Go intended to continue operating the restaurant just like before except for the name change. Problem is—none of it was true.

**(ii)    The facts**

19.     Sometime following the 341 meeting, the Subchapter V trustee discovered a newspaper article in the *Evanston Roundtable* that told the true story. A copy of the article is attached hereto as <u>Exhibit M</u>. The headline of the article stated: "Jerk-Yard takes Good to Go space with grand opening Sunday." Some relevant excerpts (with highlighted emphasis) from the article are as follows:

- Jerk-Yard Bar and Grill, a small but growing chain of family friendly sports-bar style Jamaican restaurants, will host a grand opening Sunday in the reimagined space that previously held Good to Go Jamaican at 711 Howard St.

- The owners of Good to Go, which closed after a fire devastated the restaurant's kitchen, are "sort of involved with the project," according to Jerk-Yard owner David Clausell. The two parties came to a partnership deal, he said.

- The Jerk-Yard grand opening will feature a limited menu that showcases some of chef Wesley Omar Johnson's best work, Clausell said. The new restaurant will be open from 2 to 10 p.m. Sunday, with a ribbon cutting and live DJ starting at 2.

- Clausell made some updates to the previous Good to Go space, making Jerk-Yard a bit more sporty. The restaurant holds big television screens for fans to watch games, a 120-inch projector screen, updated lighting, sound and restrooms.

- They did have to replace some kitchen items and work to get the smell of smoke out of the kitchen.

- He describes the space now as an "upscale jerk restaurant with sports."

- Wesley Omar Johnson, or "Chef Wes," as Clausell calls him, is the man behind the new menu Jerk-Yard will offer.

- By the numbers, customers at Jerk-Yard's Hyde Park and South Loop Chicago locations love the Rasta pasta, a jerk-seasoned noodle dish that Jerk-Yard serves with salmon, pot roast, chicken or vegan.

- The Evanston location is the third Clausell has opened in a year. "Three in one year is kind of crazy, but it's happening," he said.

- Besides the Chicago locations, Clausell said he has more opportunities to expand.

- "We actually got a few offers out of town," he said. "In Scottsdale, Arizona, they want us to come there — and in Houston, they want us to come to Houston. So we're going to be going on a plane soon to go look at these locations out there."

- Clausell is helping to give a new life to the space previously owned by husband and wife Tony and Lenice Levy. He told the RoundTable that a friend told him about their situation, and he got in contact with them to work out a new venture.

- The owners of Good to Go sought city assistance after the fire, but the Evanston Economic Development Committee denied the request, citing precedent and appropriate use of city loans.

20.    The above article clearly demonstrates, contrary to Lenice's testimony at the 341

meeting, that: (i) Good to Go had no plans to reopen its restaurant; (ii) the new name Jerk-Yard

16

Bar & Grill was not just a "branding that we're doing just to give some newness, some vibrancy to the, you know, to the reopening of it . . . just some new energy;" (iii) Good to Go was not going to be operating under this brand new name; (iv) the menu was not going to be the same; (v) Jerk-Yard Bar & Grill was a new, separate entity from Good to Go Jamaican Cuisine; (vi) Good to Go Jamaican Cuisine would not be operating with new managers; and (vii) Good to Go Jamaican Cuisine would not be d/b/a Jerk-Yard Bar & Grill.  Good to Go further failed to disclose at the 341 meeting its intention to lease the Real Property to Jerk-Yard Bar & Grill pursuant to a lease dated April 1, 2025 which was subsequently executed without bankruptcy court approval.  In addition to leasing the Real Property, the lease provided for the tenant, Jerk-Yard Bar & Grill, to use Good to Go's furniture, fixtures and equipment which is Village Bank's collateral.  The lease itself also violated the terms of the Mortgage prohibiting the "sale or transfer" of the Real Property, without Village Bank's prior written consent and Village Bank advised Good to Go that it did not consent to the lease.

21.     In fact, as noted above (*See*, Fn. 2), Dennis Levy had already violated the terms of the Mortgage by transferring title to the Real Property from himself and Lenice (the mortgagors under the Mortgage) to DL YVEL Land Trust.  This land trust also has its own mystery.  While Lenice testified at the 341 meeting that "DL" stood for "Dennis Levy," she refused to answer the question as to what "YVEL" stood for.  Village Bank was inquiring about the name of the land trust in an effort to ascertain who the beneficiaries are under the land trust.  Lenice testified at the 341 meeting that she and her husband were the sole beneficiaries.  But as noted above, the Petition in the instant case states that Dennis Levy has the sole interest in the Property.[5]  Counsel for

---

[5]     Furthermore, Good to Go's motion to approve interim management agreement stated that the "beneficial interests are owned by [Good to Go's] affiliates."

Village Bank requested a copy of the land trust agreement in the Good to Go case and this case but has yet to receiver it.  Thus, who the beneficiaries are of the land trust continues to be shrouded in a cloud of mystery.

22.    On July 7, 2025, Good to Go filed a motion to approve interim management agreement (the "**Motion**") as part of its bankruptcy case (Dkt. #35).  On July 14, 2025, Village Bank filed its objection to the Motion (Dkt. #46).  The proposed interim management agreement (the "**Management Agreement**"), which was actually a misnomer, confirmed that Good to Go ha**d** no intention to continue operating its business.

23.    As reflected in the Motion, the debtor stated that in early 2024, its business experienced a typical seasonal slowdown that caused it to fall behind on payments to Village Bank and that in November, 2024, a fire caused the restaurant to close.[6]  Good to Go, however, failed to state that its business was failing as far back as 2021.  Between 2021 and 2023, Good to Go failed to pay its sales taxes to the State of Illinois which filed a Notice of Tax Lien in the amount of $369,669.35 for unpaid sales tax from 2021 to 2023.  A copy of the Notice of Tax Lien is attached hereto as <u>Exhibit N</u>.  Good to Go also failed to pay: (i) payroll taxes from the 2nd quarter of 2024 in the amount of $7,700.00; (ii) worker's compensation insurance in the amount of $10,375.11; and (iii) two contractors who provided work in the Premises in the aggregate amount of $25,000.00.

---

[6]    While Good to Go admitted that the insurance company denied coverage, Good to Go failed to state that the basis for the denial was because Good to Go was unable to provide the insurance company with proof that the fire suppression system in the vent hood was being inspected, tested and serviced on a semi-annual basis by a licensed fire protection contractor as required under the policy.

**B.      The Dennis A. Levy bankruptcy (25-14814):**

24.      At the 341 meeting for the present case, the Debtor testified that his intention is still to reopen Go to Go which is how he intends to fund a reorganization plan. Apart from the fact that the Real Property is now under lease to Jerk-Yard Bar & Grill, the likelihood of Good to Go succeeding as a going-concern (after being closed for over a year) is less likely now then it was when it was in bankruptcy. Moreover, Schedule J, Line 23c of the Petition states that the Debtor's monthly net income is -$2,561.84 and the Debtor himself testified at the 341 meeting that even if Good to Go resumes operating, he does not know what his income would be.[7]

25.      But as was the case with the Good to Go bankruptcy, there are a series of misstatements in the Petition that must first be addressed before getting to the request and bases for relief in the present motion. They are as follows:

(i)      Part 2 of the Petition on Page 3 inexplicably states that there is a pending bankruptcy case (i.e., Good to Go) which is not true. As noted above, the Good to Go bankruptcy was voluntarily dismissed on July 16, 2025.

(ii)      In Part 3 of the Petition on Page 4, the Debtor states that he is a small business debtor yet the Debtor failed to file a balance sheet, statement of operations, cash-flow statement and federal income tax return or alternatively, comply with 11 U.S.C. §1116(1)(B).

(iii)      Page 3 of Form B 104 lists Village Bank as a holder of one of the 20 largest unsecured claims in the amount of $73,000.00 whereas the Debtor previously listed this debt as secured (which it is-*See* Note II above) on Schedule D of the Good to Go petition.

---

[7]      It should be noted that although the Debtor testified at the 341 meeting, his wife Lenice was also present and was constantly "feeding" him answers to questions being asked by the U.S. Trustee and counsel for Village Bank and Wintrust Bank.

19

(iv)   The attorney's disclosure of compensation shows a retainer of $5,000.00 yet the retainer agreement attached thereto shows a retainer of $6,888.00.

(v)   In Schedule A/B, Part 1, the Debtor claims that he holds the sole interest in the Real Property, title to which is held in the DL YVEL Land Trust.  However, according to Lenice's testimony at the 341 meeting in the Good to Go case, the beneficiaries of the land trust are both Dennis Levy and Lenice.

(vi)   Also in Schedule A/B, Part 1, the Debtor claims that he holds the sole interest in the investment property located at 425 Dodge Avenue, Evanston, IL and testified at the 341 meeting that title to said property was held in the DL YVEL Land Trust.  If true (which it is not), the Debtor and Lenice would both have an interest in said property as the beneficiaries under the land trust.  More importantly, title to said property was conveyed out of the DL YVEL Land Trust in February, 2025 which could constitute a fraudulent conveyance as discussed further below.

(vii)   The Petition reflects that the Debtor resides at 2006 Brummel Street, Evanston, IL which is not listed in Schedule A/B because the Debtor testified at the 341 meeting that Lenice was the sole owner of said property.  However, according to the Cook County Recorder's Office website, on April 16, 2003, the Debtor quit-claimed the property to himself and Lenice and thereafter, multiple mortgages were executed by both the Debtor and Lenice against said property. In July, 2024, the property was conveyed into the DL YVEL Land Trust and in August, 2025, the property was conveyed into the Imago DEI Evanston HS Land Trust both of which could constitute fraudulent conveyances as discussed further below.

(viii)   In Schedule A/B, Part 4, the Debtor lists his ownership interest in Good to Go at a value of $75,000.00 which he testified was the value of Good to Go's assets yet the petition filed by Good to Go (and signed by Dennis Levy) lists Good to Go's assets at a total value of $529.00.

20

(ix)    As reflected in the Petition, the Debtor owns 100% of Good to Go and during the 341 meeting, the Debtor testified that he guaranteed Good to Go's debts.  Schedule D of the petition filed in the Good to Go bankruptcy lists the following secured claims which are not listed in the Petition: (a) LEAF Capital in the amount of $180,000.00; and (b) WebBank in the amount of $141,000.00.

(x)    In Schedule E/F of the Petition, the Debtor lists the Illinois Department of Revenue and the Internal Revenue Service for notice purposes only yet in Schedule E/F of the Good to Go petition, these creditors are listed with total claim amounts of $348,000.00 and $7,700.00, respectively.

(xi)    In Schedule I, the Debtor failed to attach the required statement in Part 2, Line 8a.

(xii)    In Schedule J, Part 2, Line 21, the Debtor listed $2,562.00 as "Debtor's Spouse Investment Property Expenses."  The Debtor testified at the 341 meeting that this expense related to investment property located at 134 Callen Avenue, Evanston, IL which the Debtor testified was owned by Lenice.  According to the Cook County Recorder's website, Lenice acquired title to this property in August, 2017.  In February, 2024, Lenice conveyed title to this property into the DL YVEL Land Trust which would mean that Lenice and the Debtor thereafter became owners of the property since they are purportedly both beneficiaries under the trust.  In February, 2025, DL YVEL Land Trust conveyed the property into the Agape Evanston Callan 134 Land Trust and in September, 2025, the property was sold for $640,000.00.  The foregoing transfers could all constitute fraudulent conveyances as discussed further below.

**C.**    **The potential fraudulent conveyances:**

26.    The following facts demonstrate either that the Debtor in fact has an ownership interest in the subject properties discussed below contrary to: (a) what the Petition reflects; and (b) his testimony at the 341 meeting and/or that the subject properties were conveyed within two years prior to the filing of the Petition and, therefore, could be fraudulent transfers in violation of 11 U.S.C. §548:

(i)    425 Dodge Avenue, Evanston, IL-The deeds attached hereto as Group Exhibit O from the Cook County Recorder's Office demonstrate that this property was conveyed to Shelton Ashley, Lenice Levy and Dennis A. Levy as joint tenants on September 8, 2016. On February 28, 2024, Dennis Levy then conveyed his interest in the property to the DL YVEL Land Trust. On February 28, 2025, DL YVEL Land Trust then conveyed its interest in the property to Shekinah Light Evanston Dodge Land Trust.[8]

(ii)    2006 Brummel Street, Evanston, IL- The deeds attached hereto as Group Exhibit P from the Cook County Recorder's Office demonstrate that this property was conveyed to Lenice Levy and Dennis Levy as joint tenants on April 16, 2003. On February 29, 2024, Lenice Levy then conveyed her interest to the DL YVEL Land Trust. On February 28, 2025, DL YVEL Land Trust then conveyed its interest to Imago DEI Evanston HS Land Trust.

(iii)    134 Callen Avenue, Evanston, IL- The deeds attached hereto as Group Exhibit Q from the Cook County Recorder's Office demonstrate that this property was conveyed to Lenice Levy on August 30, 2017. On February 28, 2024, Lenice Levy then conveyed the property to the DL YVEL Land Trust. On February 28, 2025, DL YVEL Land Trust conveyed its interest to

---

[8]    The Debtor testified at the 341 meeting that Shelton Ashley is Lenice's son.

Agape Evanston Callan 134 Land Trust.  The property was then sold in September, 2025 for

$640,000.00 and Agape Evanston Callan 134 Land Trust conveyed it to Ege Demirel, the buyer.

## **REQUEST AND BASES FOR RELIEF**

27.     Village Bank and Wintrust Bank hereby request that this Court grant it relief from

the automatic stay so that Village Bank and Wintrust Bank may proceed with the pending

Foreclosure Action against the Personal Property and Real Property.

28.     Section 362(d) of the Bankruptcy Code provides that the Court shall grant relief

from the automatic stay:

> (1)     for cause, including lack of adequate protection of an interest in property of such party in interest;

> (2)     with respect to a stay of an act against property under subsection (a) of this section if-

>> (A)     the debtor does not have equity in such property; and
>> (B)     such property is not necessary to an effective reorganization.

29.     In this case, the Court should grant relief from the automatic stay under §§362(d)(1)

and 362(d)(2).

**Section 362(d)(1) relief:**

30.     Although "cause" is not defined in the Bankruptcy Code, relief from the stay for

cause is a discretionary determination made on a case by case basis.  *In re JE Livestock, Inc.*, 375

B.R. 892, 897 (B.A.P. 10th Cir. 2007); *see, also, In re Merchant*, 256 B.R. 572, 576 (Bankr. W.D.

Pa. 2000) (cause is an intentionally broad and flexible concept which must be determined on a

case-by-case basis).  The term "cause" under Section 362(d)(1) means "any reason whereby a

creditor is receiving less than his bargain from a debtor and is without a remedy because of the

bankruptcy proceeding.  *In re Martens*, 331 B.R. 395, 398 (B.A.P. 8th Cir. 2005).

31.     Here, "cause" exists for relief from the automatic stay because Village Bank and Wintrust Bank are not adequately protected in the Personal Property on account of the Debtor's failure, as owner of Good to Go, to properly have the fire suppression equipment serviced and maintained resulting in the insurance company denying coverage for the damage to the Personal Property caused by the fire. The Debtor has also failed to provide Village Bank and Wintrust Bank with additional or replacement liens on other unencumbered assets of the Debtor.

32.     Furthermore, the Debtor has been mismanaging the Real Property by failing to pay the property taxes on the Real Property. Therefore, Village Bank requires the appointment of a receiver in the Foreclosure Action in order to collect rental payments from the tenant. Courts have recognized that the failure of a mortgagor to pay real estate taxes constitutes cause for lifting the automatic stay for lack of adequate protection. *In re 183 Lorraine Street Associates*, 198 B.R. 16, 23 (E.D.N.Y. 1996); *In re Heinzeroth*, 40 B.R. 518, 520 (Bankr. E.D. Pa. 1984) and *In re Ausherman*, 34 B.R. 393,394 (Bankr. N.D. Ill. 1983). *In re Vita Craft Corp.*, 625 B.R. 491, 504 (Bankr. D. Kan. 2020) ("Moreover, the parties agree that [debtor] is not paying its property taxes. [Mortgage lender] has therefore established a prima facie case that it is entitled to stay relief for lack of adequate protection under § 362(d)(1)").

33.     The Debtor has also failed to make any post-petition mortgage payments which by itself is sufficient cause to grant relief from the automatic stay. *In re Jones*, 284 B.R. 92, 98 (Bankr. E.D. Pa. 2002) (failure to make post-petition mortgage payments held to be sufficient cause to grant relief from the automatic stay); *see, also, In re Watson*, 286 B.R. 594, 604 (Bankr. D.N.J. 2002) (debtor's failure to make post-petition payments is sufficient cause to justify granting relief from the automatic stay).

24

**Section 362(d)(2) relief:**

34.     Section 362(d)(2) provides additional grounds for relief from the stay where the debtor has no equity in the property and it is not necessary to an effective reorganization.  Here, there is no equity in either the Personal Property or Real Property.

35.     According to the petition filed by Good to Go, the value of the Personal Property was $529.00.  According to the Petition filed in this case, the Debtor valued the Personal Property at $75,000.00.  The liens against the Personal Property exceed $2,349,000.00.  Clearly, the Debtor, as the owner of Good to Go, has no equity in the Personal Property which is thus not necessary to an effective reorganization.

36.     There is also no equity in the Real Property.  As of August 27, 2024, the Real Property was appraised at $995,000.00 and the liens against the Real Property total at least $1,109,570.09 (Village Bank =$ 668,407.38; SBA=$430,902.54; and Willow Electric=$10,260.17).  An excerpt of the appraisal is attached hereto as Exhibit R.

<u>CONCLUSION</u>

37.     It would appear that the Debtor is overextended and does not have the resources available to address the needs of the Personal Property or Real Property.  Neither the Personal Property nor Real Property have any value to the Debtor.  The Debtor also allowed the Personal Property and Real Property to be damaged by the fire for which the insurance company has now denied coverage.

38.     Based on the foregoing (not to mention the conduct of the Debtor in this case as well as the conduct of Good to Go in the prior bankruptcy case; both of which warrant dismissal of this case), this is a case where cause exists for providing relief from the automatic stay due to lack of adequate protection as well as lack of equity in both the Personal Property and Real

Property and, therefore, the stay should be lifted so that Village Bank and Wintrust Bank can have a receiver appointed in the Foreclosure Action and complete the pending Foreclosure Action of the Personal Property and Real Property.

39.    This Court has authority to order that Rule 4001(a)(3) is not applicable to the order entered in granting this motion and Village Bank and Wintrust Bank request that this Court so order.

**WHEREFORE**, Village Bank & Trust Company, N.A. and Wintrust Bank, N.A. request that the Court enter an Order (i) modifying the automatic stay to permit Village Bank and Wintrust Bank to enforce their state law rights and remedies under the Notes, Note I Security Agreement, Note II Security Agreement, Mortgage and Assignment of Rents including, but not limited to, continuation of the Foreclosure Action against the Personal Property and Real Property; (ii) waiving the applicability of Rule 4001(a)(3) and holding such order effective immediately upon its entry; and (iii) granting such other and further relief as may be deemed appropriate.

Dated: December 5, 2025                 Respectfully submitted,

                                        Village Bank & Trust Company, N.A. and
                                        Wintrust Bank, N.A.

                                        By: /s/ Scott H. Kenig
                                              One of Its Attorneys

                                        Scott H. Kenig (6198729)
                                        Randall & Kenig LLP
                                        455 N. Cityfront Plaza Drive
                                        NBC Tower
                                        Suite 2510
                                        Chicago, Illinois 60611
                                        Telephone:    312.822.0800
                                        Facsimile:    312.822.0215
                                        skenig@randall-law.com

SKENIG/604372

# PROMISSORY NOTE



EXHIBIT
A

| | | | |
|---|---|---|---|
| **Borrower:** | Good To Go Jamaican Cuisine LLC, Dennis A. Levy and Lenice D. Levy 711 W. Howard Street Evanston, IL 60202 | **Lender:** | Village Bank & Trust, N.A. 234 West Northwest Highway Arlington Heights, IL 60004 |

**Principal Amount: $518,000.00**                                    Date of Note: November 1, 2023

PROMISE TO PAY. Good To Go Jamaican Cuisine LLC, Dennis A. Levy and Lenice D. Levy ("Borrower") jointly and severally promise to pay to Village Bank & Trust, N.A. ("Lender"), or order, in lawful money of the United States of America, the principal amount of Five Hundred Eighteen Thousand & 00/100 Dollars ($518,000.00), together with interest on the unpaid principal balance from November 1, 2023, until paid in full.

PAYMENT. Subject to any payment changes resulting from changes in any index for this loan, Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: 60 monthly consecutive principal and interest payments of $3,946.30 each, beginning December 1, 2023, with interest calculated on the unpaid principal balances using an interest rate of 7.800% ("Payment Stream 1"); 59 monthly consecutive principal and interest payments, beginning December 1, 2028, with interest calculated on the unpaid principal balances using an interest rate based on the index described below, plus a margin of 1.000 percentage points, the sum rounded to the nearest 0.001% ("Payment Stream 2"); and one principal and interest payment on November 1, 2033, with interest calculated on the unpaid principal balances using an interest rate based on the index described below, plus a margin of 1.000 percentage points, the sum rounded to the nearest 0.001% ("Payment Stream 3"). The final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note; then to late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

VARIABLE INTEREST RATE. This Note shall be subject to more than one interest rate, as described herein. The current rate for any index for this loan is not necessarily the lowest rate charged by Lender on its loans. If Lender determines, in its sole discretion, that any index for this Note has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust any margin corresponding to the index being substituted to accompany the substitute index. Margins corresponding to the index are described in the "Payments" section. The change to the margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. Lender will tell Borrower the current rate for any index for this loan upon Borrower's request. Borrower understands that Lender may make loans based on other rates as well. Notwithstanding any other provision of this Note, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the due date of the last payment in the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law. Whenever changes occur in the interest rate, Lender, at its option, may do one or more of the following: (A) change the amounts of Borrower's payments to maintain the original amortization schedule, (B) increase Borrower's payments to cover accruing interest if the interest rate adjustment is an increase, (C) change the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and change Borrower's final payment amount.

Payment Stream 1. The interest rate on this payment stream is 7.800%.

Payment Streams 2-3. The interest rate on these payment streams is subject to change from time to time based on changes in an independent index which is the Prime Rate as published in the Money Rates section of The Wall Street Journal (the "Index"). The interest rate change will not occur more often than each day. The interest rate or rates to be applied to the unpaid principal balance during these payment streams will be the rate or rates set forth herein in the "Payment" section.

INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

PREPAYMENT PENALTY. Upon prepayment of this Note, Lender is entitled to the following prepayment penalty: In addition to all principal, interest and costs owing at the time of prepayment, with a one (1) business days' notice, Borrower agrees to pay a prepayment premium equal to: 5% of the amount of principal being prepaid, if paid on or prior to 12th month from the date of the Promissory Note issuance date; 3% of the amount of principal being prepaid, if paid on or after 13th month from the date of the Promissory Note issuance date but on or prior to 24th month from the Promissory Note issuance date; 1% of the amount of principal being prepaid, if paid on or after the 25th month from the Promissory Note issuance date but on or prior to the 36th month from the Promissory Note issuance date; 0% of the amount of principal being prepaid, if paid on or after 37th month from the date of the Promissory Note issuance date but on or prior to the 48th month from the Promissory Note issuance date; 0% of the amount of principal being prepaid, if paid on or after the 49th month until maturity. Borrower's notice of its intent to prepay shall be irrevocable. If the balance of this Note is accelerated in accordance with the terms of this Note, the resulting balance due shall be considered a prepayment due and payable as of the date of acceleration and shall be subject to the applicable premium if due and payable during a time period stated above. Borrower agrees that the prepayment premium is payable as liquidated damages for the loss of bargain, and its payments shall not in any way reduce, affect or impair any other obligation of the Borrower under this Note. In any event, all prepayments shall be applied to installments of principal in their inverse order of maturity, and no prepayment shall reduce the dollar amount of fixed principal installments required to be paid, until this Note is paid in full. Except for the foregoing, Borrower may pay all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Village Bank & Trust, N.A., 234 West Northwest Highway Arlington Heights, IL 60004.

LATE CHARGE. If a payment is 10 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment.

INTEREST AFTER DEFAULT. Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 6.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. After maturity, or after this Note would have matured had there been

**PROMISSORY NOTE**

**(Continued)**

no default, the Default Rate Margin will continue to apply to the final interest rate described in this Note. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default In Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any loan.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party or any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Illinois.

**CONFESSION OF JUDGMENT.** Borrower hereby irrevocably authorizes and empowers any attorney-at-law to appear in any court of record and to confess judgment against Borrower for the unpaid amount of this Note as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorneys' fees plus costs of suit, and to release all errors, and waive all rights of appeal. If a copy of this Note, verified by an affidavit, shall have been filed in the proceeding, it will not be necessary to file the original as a warrant of attorney. Borrower waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing warrant and power to confess judgment will be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void; but the power will continue undiminished and may be exercised from time to time as Lender may elect until all amounts owing on this Note have been paid in full. Borrower hereby waives and releases any and all claims or causes of action which Borrower might have against any attorney acting under the terms of authority which Borrower has granted herein arising out of or connected with the confession of judgment hereunder.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the

PROMISSORY NOTE
(Continued)

Loan No: 310002115-1                                                                    Page 3

specific inaccuracy(ies) should be sent to Lender at the following address: Village Bank & Trust, N.A. 234 West Northwest Highway Arlington Heights, IL 60004.

**DOCUSIGN PROVISION.** Each of the parties hereto agrees that this agreement and all other related documents may be entered into by means of (i) a DocuSign® electronic signature or another electronic signature that Lender accepts or (ii) manual signature. Each party agrees, and acknowledges that it is such party's intent, that if such party signs this agreement and/or all other related documents using an electronic signature, it is signing, adopting, and accepting this agreement and/or all other related documents and that signing this agreement and/or all other related documents using an electronic signature is the legal equivalent of having placed its handwritten signature on this agreement and/or all other related documents. The use of electronic signatures, records and transmissions (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

**TRANSFERABLE RECORD.** Borrower expressly agrees that this Note is a "transferable record" as defined in applicable law relating to electronic transactions and that it may be created, authenticated, stored, transmitted and transferred in a manner consistent with and permitted by such applicable law.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness; (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (d) apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine; (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; and (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**ILLINOIS INSURANCE NOTICE.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by their agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on Borrower's own.

PRIOR TO SIGNING THIS NOTE, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. EACH BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

GOOD TO GO JAMAICAN CUISINE LLC

By: _____
Dennis A. Levy, Manager of Good To Go Jamaican
Cuisine LLC

X _____                    X _____
Dennis A. Levy, Individually                      Lesline D. Levy, Individually

Illinois Anti-Predatory
Lending Database
Program

Certificate of Exemption



Report Mortgage Fraud
844-768-1713

Doc#. 2330729020 Fee: $107.00
Karen A. Yarbrough
Cook County Clerk
Date: 11/03/2023 11:42 AM Pg: 1 of 15

The property identified as:     PIN: 11-30-124-030-0000

Address:
Street:      709-711 W. Howard Street
Street line 2:
City: Evanston                State: IL              ZIP Code: 60202

Lender: Village Bank & Trust, N.A.

Borrower: Dennis A. Levy and Lenice D. Levy

Loan / Mortgage Amount: $518,000.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because
it is commercial property.

Certificate number: E28E6AC1-C9AB-427C-93B4-51F895E07F0D         Execution date: 11/1/2023

EXHIBIT
B

RECORDATION REQUESTED BY:
Village Bank & Trust, N.A.
234 West Northwest Highway
Arlington Heights, IL  60004

WHEN RECORDED MAIL TO:
Village Bank & Trust, N.A.
9801 W Higgins Suite 400
Rosemont, IL  60108

FOR RECORDER'S USE ONLY

This Mortgage prepared by:
Loan Operations Administrator, Loan Operations
Village Bank & Trust, N.A.
234 West Northwest Highway
Arlington Heights, IL 60004

## MORTGAGE

**MAXIMUM LIEN.** At no time shall the principal amount of Indebtedness secured by the Mortgage, not including sums advanced to protect the security of the Mortgage, exceed $1,036,000.00.

THIS MORTGAGE dated November 1, 2023, is made and executed between Dennis A. Levy and Lenice O. Levy, husband and wife, in joint tenancy (referred to below as "Grantor") and Village Bank & Trust, N.A., whose address is 234 West Northwest Highway, Arlington Heights, IL  60004 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, Grantor mortgages, warrants, and conveys to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Cook County, State of Illinois:

Lots 36 and 37 in Block 8 in Brummel and Case Howard Terminal Addition, a subdivision of that part of the Northwest 1/4 of Section 30, Township 41 North, Range 14, East of the Third Principal Meridian, commencing at the Southeast corner of Northwest 1/4; thence North on the East line of the Northwest 1/4 of said section 19.65 chains; thence West 19 chains to an intersection with center line of Ridge Road; thence South 5 degrees East on center line of Ridge Road to the South line of the Southeast 1/4 of the Northwest 1/4; thence East on the South line of the Southeast 1/4 of the Northwest 1/4 14.99 chains to the place of beginning (except public streets and alleys), in Cook County, Illinois.

The Real Property or its address is commonly known as  709-711 W. Howard Street, Evanston, IL  60202. The Real Property tax identification number is 11-30-124-030-0000 and 11-30-124-031-0000.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property.  In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE  (A)  PAYMENT OF THE INDEBTEDNESS AND  (B)

PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

**GRANTOR'S WAIVERS.** Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (a) this Mortgage is executed at Borrower's request and not at the request of Lender; (b) Grantor has the full power, right, and authority to enter into this Mortgage and to hypothecate the Property; (c) the provisions of this Mortgage do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Borrower shall pay to Lender all indebtedness secured by this Mortgage as it becomes due, and Borrower and Grantor shall strictly perform all Borrower's and Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

Possession and Use. Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

Duty to Maintain. Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

Compliance With Environmental Laws. Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's

## MORTGAGE
### (Continued)

ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any restructuring of the legal entity (whether by merger, division or otherwise) or any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Illinois law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest

paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials and the cost exceeds $1,000.00. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain flood insurance, if available, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan. Flood insurance may be purchased under the National Flood Insurance Program, from private insurers providing "private flood insurance" as defined by applicable federal flood insurance statutes and regulations, or from another flood insurance provider that is both acceptable to Lender in its sole discretion and permitted by applicable federal flood insurance statutes and regulations.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $1,000.00. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon

## MORTGAGE
### (Continued)

satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**TAX AND INSURANCE RESERVES.** Grantor agrees to establish and maintain a reserve account to be retained from the initial proceeds of the loan evidenced by the Note in such amount deemed to be sufficient by Lender to (A) create an adequate cushion and (B) provide enough funds to be in a position to make timely payment of real estate taxes and insurance premiums as otherwise required herein. Grantor shall pay monthly, or at such other interval as payments under the Note may be due, an amount equivalent to 1/12th, or if payments are not monthly, such fraction as Lender will require consistent with applicable law, of the total annual payments Lender reasonably anticipates making from the reserve account to pay real estate taxes and premiums for insurance policies required to be maintained on the Real Property, as estimated by Lender. If required by Lender, Grantor shall further pay at the same frequency into the reserve account a pro-rata share of all annual assessments and other charges which may accrue against the Real Property as required by Lender. If the amount so estimated and paid shall prove to be insufficient to pay such property taxes, insurance premiums, assessments and other charges, subject to the requirements of applicable law, Grantor shall pay the difference in one or more payments as Lender requires. All such payments shall be carried in an interest-free reserve account with Lender, provided that if this Mortgage is executed in connection with the granting of a mortgage on a single-family owner-occupied residential property, Grantor, in lieu of establishing such reserve account, may pledge an interest-bearing savings account with Lender to secure the payment of estimated real estate taxes, insurance premiums, assessments, and other charges. Lender shall have the right to draw upon the reserve (or pledge) account to pay such items, and Lender shall not be required to determine the validity or accuracy of any item before paying it. Nothing herein or in any of the Related Documents shall be construed as requiring Lender to advance other monies for such purposes, and Lender shall not incur any liability for anything it may do or omit to do with respect to the reserve account. If Lender discovers that the payments into the reserve account have produced a surplus beyond the annual amounts due to be paid from the reserve funds by more than the cushion permitted by applicable law, but a payment on the Note has not been received within 30 days of the payment due date, Lender may retain the excess funds. All amounts in the reserve account are hereby pledged to further secure the Indebtedness, and Lender is hereby authorized to withdraw and apply such amounts on the Indebtedness upon the occurrence of an Event of Default as described below.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

Title. Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee

## MORTGAGE
### (Continued)

simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

## MORTGAGE
### (Continued)

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-In-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Borrower and Grantor pay all the Indebtedness when due, and Grantor otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Borrower, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Borrower), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Mortgage and this Mortgage shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Mortgage or of any note or other instrument or agreement evidencing

the Indebtedness and the Property will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Mortgage.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with the Property.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's ability to repay the Indebtedness or Borrower's or Grantor's ability to perform their respective obligations under this Mortgage or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Borrower's or Grantor's existence as a going business or the death of any member, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower or Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser,

## MORTGAGE
### (Continued)

surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Mortgage within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Borrower or Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty that Borrower would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waive any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to

## MORTGAGE
### (Continued)

sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or Borrower and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

## MORTGAGE
## (Continued)

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the State of Illinois.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Mortgage.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any person or circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other person or circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waive Jury.** All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Illinois as to all Indebtedness secured by this Mortgage.

**Waiver of Right of Redemption.** NOTWITHSTANDING ANY OF THE PROVISIONS TO THE CONTRARY CONTAINED IN THIS MORTGAGE, GRANTOR HEREBY WAIVES, TO THE EXTENT PERMITTED UNDER 735 ILCS 5/15-1601(b) OR ANY SIMILAR LAW EXISTING AFTER THE DATE OF THIS MORTGAGE, ANY AND ALL RIGHTS OF REDEMPTION ON GRANTOR'S BEHALF AND ON BEHALF OF ANY OTHER PERSONS PERMITTED TO REDEEM THE PROPERTY.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in

## MORTGAGE
### (Continued)

lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Good To Go Jamaican Cuisine LLC, Dennis A. Levy and Lenice D. Levy and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Grantor.** The word "Grantor" means Dennis A. Levy and Lenice D. Levy.

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage.

**Lender.** The word "Lender" means Village Bank & Trust, N.A., its successors and assigns.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Note.** The word "Note" means a Promissory Note dated November 1, 2023, as amended from time to time, in the original principal amount of $518,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or credit agreement. **NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.**

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

### MORTGAGE
### (Continued)

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

EACH GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND EACH GRANTOR AGREES TO ITS TERMS.

GRANTOR:

X _____
Dennis A. Levy

X _____
Lenice D. Levy

---

### INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Illinois_ )
                                            ) SS
COUNTY OF _Cook_ )

On this day before me, the undersigned Notary Public, personally appeared **Dennis A. Levy and Lenice D. Levy**, to me known to be the individuals described in and who executed the Mortgage, and acknowledged that they signed the Mortgage as their free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this _1st_ day of _Nvem_ , 20 _23_ .

By _____        Residing at _____

Notary Public in and for the State of _Illinois_

My commission expires _____

OFFICIAL SEAL
JILL E PASKO
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 05/04/2026

---

LaserPro, Ver. 23.3.0.027   Copr. Finastra USA Corporation 1997, 2023.   All Rights Reserved.   - IL
D:\LaserPro\CCO\CFI\LPL\G03.FC  TR-54222  PR-7

**MORTGAGE**
**(Continued)**

Doc#. 2330729021 Fee: $107.00
Karen A. Yarbrough
Cook County Clerk
Date: 11/03/2023 11:42 AM Pg: 1 of 9

RECORDATION REQUESTED BY:
Village Bank & Trust, N.A.
234 West Northwest Highway
Arlington Heights, IL  60004

WHEN RECORDED MAIL TO:
Village Bank & Trust, N.A.
9801 W Higgins Suite 400
Rosemont, IL  60108

JPJH4 23·00 2896   Dr4

FOR RECORDER'S USE ONLY

This ASSIGNMENT OF RENTS prepared by:
Loan Operations Administrator, Loan Operations
Village Bank & Trust, N.A.
234 West Northwest Highway
Arlington Heights, IL 60004

## ASSIGNMENT OF RENTS

THIS ASSIGNMENT OF RENTS dated November 1, 2023, is made and executed between Dennis A. Levy and Lenice D. Levy, husband and wife, in joint tenancy (referred to below as "Grantor") and Village Bank & Trust, N.A., whose address is 234 West Northwest Highway, Arlington Heights, IL  60004 (referred to below as "Lender").

ASSIGNMENT. For valuable consideration, Grantor hereby assigns, grants a continuing security interest in, and conveys to Lender all of Grantor's right, title, and interest in and to the Rents from the following described Property located in Cook County, State of Illinois:

Lots 36 and 37 in Block 8 in Brummel and Case Howard Terminal Addition, a subdivision of that part of the Northwest 1/4 of Section 30, Township 41 North, Range 14, East of the Third Principal Meridian, commencing at the Southeast corner of Northwest 1/4; thence North on the East line of the Northwest 1/4 of said section 19.65 chains; thence West 19 chains to an intersection with center line of Ridge Road; thence South 5 degrees East on center line of Ridge Road to the South line of the Southeast 1/4 of the Northwest 1/4; thence East on the South line of the Southeast 1/4 of the Northwest 1/4 14,99 chains to the place of beginning (except public streets and alleys), in Cook County, Illinois.

The Property or its address is commonly known as  709-711 W. Howard Street, Evanston, IL  60202.  The Property tax identification number is 11-30-124-030-0000 and 11-30-124-031-0000.

THIS ASSIGNMENT IS GIVEN TO SECURE  (1) PAYMENT OF THE INDEBTEDNESS AND  (2) PERFORMANCE OF ANY AND ALL OBLIGATIONS OF BORROWER AND GRANTOR UNDER THE NOTE, THIS ASSIGNMENT, AND THE RELATED DOCUMENTS.  THIS ASSIGNMENT IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

GRANTOR'S WAIVERS.  Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a



## ASSIGNMENT OF RENTS
### (Continued)

power of sale.

**BORROWER'S WAIVERS AND RESPONSIBILITIES.** Lender need not tell Borrower about any action or inaction Lender takes in connection with this Assignment. Borrower assumes the responsibility for being and keeping informed about the Property. Borrower waives any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the Property, or any delay by Lender in realizing upon the Property. Borrower agrees to remain liable under the Note with Lender no matter what action Lender takes or fails to take under this Assignment.

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Assignment or any Related Documents, Grantor shall pay to Lender all amounts secured by this Assignment as they become due, and shall strictly perform all of Grantor's obligations under this Assignment. Unless and until Lender exercises its right to collect the Rents as provided below and so long as there is no default under this Assignment, Grantor may remain in possession and control of and operate and manage the Property and collect the Rents, provided that the granting of the right to collect the Rents shall not constitute Lender's consent to the use of cash collateral in a bankruptcy proceeding.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that:

**Ownership.** Grantor is entitled to receive the Rents free and clear of all rights, loans, liens, encumbrances, and claims except as disclosed to and accepted by Lender in writing.

**Right to Assign.** Grantor has the full right, power and authority to enter into this Assignment and to assign and convey the Rents to Lender.

**No Prior Assignment.** Grantor has not previously assigned or conveyed the Rents to any other person by any instrument now in force.

**No Further Transfer.** Grantor will not sell, assign, encumber, or otherwise dispose of any of Grantor's rights in the Rents except as provided in this Assignment.

**LENDER'S RIGHT TO RECEIVE AND COLLECT RENTS.** Lender shall have the right at any time, and even though no default shall have occurred under this Assignment, to collect and receive the Rents. For this purpose, Lender is hereby given and granted the following rights, powers and authority:

**Notice to Tenants.** Lender may send notices to any and all tenants of the Property advising them of this Assignment and directing all Rents to be paid directly to Lender or Lender's agent.

**Enter the Property.** Lender may enter upon and take possession of the Property; demand, collect and receive from the tenants or from any other persons liable therefor, all of the Rents; institute and carry on all legal proceedings necessary for the protection of the Property, including such proceedings as may be necessary to recover possession of the Property; collect the Rents and remove any tenant or tenants or other persons from the Property.

**Maintain the Property.** Lender may enter upon the Property to maintain the Property and keep the same in repair; to pay the costs thereof and of all services of all employees, including their equipment, and of all continuing costs and expenses of maintaining the Property in proper repair and condition, and also to pay all taxes, assessments and water utilities, and the premiums on fire and other insurance effected by Lender on the Property.

**Compliance with Laws.** Lender may do any and all things to execute and comply with the laws of the State of Illinois and also all other laws, rules, orders, ordinances and requirements of all other governmental agencies affecting the Property.

**Lease the Property.** Lender may rent or lease the whole or any part of the Property for such term or terms and on such conditions as Lender may deem appropriate.

**Employ Agents.** Lender may engage such agent or agents as Lender may deem appropriate, either in Lender's name or in Grantor's name, to rent and manage the Property, including the collection and application of Rents.

**Other Acts.** Lender may do all such other things and acts with respect to the Property as Lender may deem appropriate and may act exclusively and solely in the place and stead of Grantor and to have all of the powers of Grantor for the purposes stated above.

**No Requirement to Act.** Lender shall not be required to do any of the foregoing acts or things, and the fact that Lender shall have performed one or more of the foregoing acts or things shall not require Lender to do any other specific act or thing.

**APPLICATION OF RENTS.** All costs and expenses incurred by Lender in connection with the Property shall be for Grantor's account and Lender may pay such costs and expenses from the Rents. Lender, in its sole discretion, shall determine the application of any and all Rents received by it; however, any such Rents received by Lender which are not applied to such costs and expenses shall be applied to the Indebtedness. All expenditures made by Lender under this Assignment and not reimbursed from the Rents shall become a part of the Indebtedness secured by this Assignment, and shall be payable on demand, with interest at the Note rate from date of expenditure until paid.

**FULL PERFORMANCE.** If Grantor pays all of the Indebtedness when due and otherwise performs all the obligations imposed upon Grantor under this Assignment, the Note, and the Related Documents, Lender shall execute and deliver to Grantor a suitable satisfaction of this Assignment and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Property. Any termination fee required by law shall be paid by Grantor, if permitted by applicable law.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Borrower, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Borrower), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Assignment and this Assignment shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Assignment or of any note or other instrument or agreement evidencing the Indebtedness and the Property will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Assignment.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Assignment or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Assignment or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Rents or the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Assignment also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Assignment:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation,

**ASSIGNMENT OF RENTS**
**(Continued)**

covenant or condition contained in this Assignment or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default on Other Payments.** Failure of Grantor within the time required by this Assignment to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Default in Favor of Third Parties.** Borrower or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or Grantor's property or ability to perform their respective obligations under this Assignment or any of the Related Documents.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with the Property.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Assignment or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Assignment or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Borrower's or Grantor's existence as a going business or the death of any member, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against the Rents or any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Property Damage or Loss.** The Property is lost, stolen, substantially damaged, sold, or borrowed against.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Assignment within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the

default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of any Event of Default and at any time thereafter, Lender may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Borrower or Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty that Borrower would be required to pay.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender shall have all the rights provided for in the Lender's Right to Receive and Collect Rents Section, above. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Assignment or the Note or by law.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Assignment, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Assignment, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Assignment:

**Amendments.** This Assignment, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Assignment. No alteration of or amendment to this Assignment shall be effective unless given in writing and signed by the party or

parties sought to be charged or bound by the alteration or amendment.

**Caption Headings.** Caption headings in this Assignment are for convenience purposes only and are not to be used to interpret or define the provisions of this Assignment.

**Governing Law.** This Assignment will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Assignment has been accepted by Lender in the State of Illinois.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Assignment shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Assignment.

**Merger.** There shall be no merger of the interest or estate created by this Assignment with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Interpretation.** (1)  In all cases where there is more than one Borrower or Grantor, then all words used in this Assignment in the singular shall be deemed to have been used in the plural where the context and construction so require.  (2)  If more than one person signs this Assignment as "Grantor," the obligations of each Grantor are joint and several.  This means that if Lender brings a lawsuit, Lender may sue any one or more of the Grantors.  If Borrower and Grantor are not the same person, Lender need not sue Borrower first, and that Borrower need not be joined in any lawsuit.  (3)  The names given to paragraphs or sections in this Assignment are for convenience purposes only.  They are not to be used to interpret or define the provisions of this Assignment.

**No Waiver by Lender.**  Lender shall not be deemed to have waived any rights under this Assignment unless such waiver is given in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by Lender of a provision of this Assignment shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Assignment.  No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions.  Whenever the consent of Lender is required under this Assignment, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.**  Any notice required to be given under this Assignment shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Assignment.  Any party may change its address for notices under this Assignment by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.  For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address.  Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Powers of Attorney.**  The various agencies and powers of attorney conveyed on Lender under this Assignment are granted for purposes of security and may not be revoked by Grantor until such time as the same are renounced by Lender.

**Severability.**  If a court of competent jurisdiction finds any provision of this Assignment to be illegal, invalid, or unenforceable as to any person or circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other person or circumstance.  If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable.  If the offending provision cannot be so modified, it shall be considered deleted from this Assignment.  Unless otherwise

required by law, the illegality, invalidity, or unenforceability of any provision of this Assignment shall not affect the legality, validity or enforceability of any other provision of this Assignment.

**Successors and Assigns.** Subject to any limitations stated in this Assignment on transfer of Grantor's interest, this Assignment shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Assignment and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Assignment or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Assignment.

**Waive Jury.** All parties to this Assignment hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Illinois as to all Indebtedness secured by this Assignment.

**Waiver of Right of Redemption.** NOTWITHSTANDING ANY OF THE PROVISIONS TO THE CONTRARY CONTAINED IN THIS ASSIGNMENT, GRANTOR HEREBY WAIVES, TO THE EXTENT PERMITTED UNDER 735 ILCS 5/15 1601(b) OR ANY SIMILAR LAW EXISTING AFTER THE DATE OF THIS ASSIGNMENT, ANY AND ALL RIGHTS OF REDEMPTION ON GRANTOR'S BEHALF AND ON BEHALF OF ANY OTHER PERSONS PERMITTED TO REDEEM THE PROPERTY.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Assignment. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Assignment shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Assignment.** The word "Assignment" means this ASSIGNMENT OF RENTS, as this ASSIGNMENT OF RENTS may be amended or modified from time to time, together with all exhibits and schedules attached to this ASSIGNMENT OF RENTS from time to time.

**Borrower.** The word "Borrower" means Good To Go Jamaican Cuisine LLC, Dennis A. Levy and Lenice D. Levy.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Assignment in the default section of this Assignment.

**Grantor.** The word "Grantor" means Dennis A. Levy and Lenice D. Levy.

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Assignment, together with interest on such amounts as provided in this Assignment.

**Lender.** The word "Lender" means Village Bank & Trust, N.A., its successors and assigns.

**Note.** The word "Note" means a Promissory Note dated November 1, 2023, as amended from time to time, in the original principal amount of $518,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as

## ASSIGNMENT OF RENTS
### (Continued)

Page 8

---

described in the "Assignment" section of this Assignment.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all of Grantor's present and future rights, title and interest in, to and under any and all present and future leases, including, without limitation, all rents, revenue, income, issues, royalties, bonuses, accounts receivable, cash or security deposits, advance rentals, profits and proceeds from the Property, and other payments and benefits derived or to be derived from such leases of every kind and nature, whether due now or later, including without limitation Grantor's right to enforce such leases and to receive and collect payment and proceeds thereunder.

THE UNDERSIGNED ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS ASSIGNMENT. THIS DOCUMENT IS EXECUTED ON NOVEMBER 1, 2023.

GRANTOR:

X _____
Dennis A. Levy

X _____
Lenice D. Levy

---

### INDIVIDUAL ACKNOWLEDGMENT

STATE OF __Illinois__                    )
                                         ) SS
COUNTY OF __Cook__                       )

On this day before me, the undersigned Notary Public, personally appeared **Dennis A. Levy** and **Lenice D. Levy**, to me known to be the individuals described in and who executed the ASSIGNMENT OF RENTS, and acknowledged that they signed the Assignment as their free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this __1 ST__ day of __November__, 20 __23__.

By _____         Residing at _____

Notary Public in and for the State of __Illinois__

My commission expires _____

OFFICIAL SEAL
JILL E PASKO
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 05/04/2026

## ASSIGNMENT OF RENTS
### (Continued)

LaserPro, Ver. 23.3.0.027   Copr. Finastra USA Corporation 1997, 2023.   All Rights Reserved.   - IL
D:\LaserPro\CCO\CFI\LPL\G14.FC  TR-54222  PR-7

# COMMERCIAL SECURITY AGREEMENT

EXHIBIT

D

| Borrower: | Good To Go Jamaican Cuisine LLC, Dennis A. Levy and Lanice D. Levy 711 W. Howard Street Evanston, IL 60202 | Lender: | Village Bank & Trust, N.A. 234 West Northwest Highway Arlington Heights, IL 60004 |
|---|---|---|---|
| Grantor: | Good To Go Jamaican Cuisine LLC 711 W. Howard Street Evanston, IL 60202 | | |

THIS COMMERCIAL SECURITY AGREEMENT dated November 1, 2023, is made and executed among Good To Go Jamaican Cuisine LLC ("Grantor"); Good To Go Jamaican Cuisine LLC, Dennis A. Levy and Lenice D. Levy ("Borrower"); and Village Bank & Trust, N.A. ("Lender").

GRANT OF SECURITY INTEREST. For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

COLLATERAL DESCRIPTION. The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles and Fixtures

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

FUTURE ADVANCES. In addition to the Note, this Agreement secures all future advances made by Lender to Borrower regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

BORROWER'S WAIVERS AND RESPONSIBILITIES. Except as otherwise required under this Agreement or by applicable law, (A) Borrower agrees that Lender need not tell Borrower about any action or inaction Lender takes in connection with this Agreement; (B) Borrower assumes the responsibility for being and keeping informed about the Collateral; and (C) Borrower waives any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the Collateral or any delay by Lender in realizing upon the Collateral; and Borrower agrees to remain liable under the Note no matter what action Lender takes or fails to take under this Agreement.

GRANTOR'S REPRESENTATIONS AND WARRANTIES. Grantor warrants that: (A) this Agreement is executed at Borrower's request and not at the request of Lender; (B) Grantor has the full right, power and authority to enter into this Agreement and to pledge the Collateral to Lender; (C) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (D) Lender has made no representation to Grantor about Borrower or Borrower's creditworthiness.

GRANTOR'S WAIVERS. Grantor waives all requirements of presentment, protest, demand, and notice of dishonor or non-payment to Borrower or Grantor, or any other party to the Indebtedness or the Collateral. Lender may do any of the following with respect to any obligation of any Borrower, without first obtaining the consent of Grantor: (A) grant any extension of time for any payment, (B) grant any renewal, (C) permit any modification of payment terms or other terms, or (D) exchange or release any Collateral or other security. No such act or failure to act shall affect Lender's rights against Grantor or the Collateral.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL. With respect to the Collateral, Grantor represents and promises to Lender that:

Perfection of Security Interest. Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Borrower may not be indebted to Lender.

Notices to Lender. Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above, or at the location specified in the Collateral definition in this Agreement, or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not not move the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Illinois, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, including without limitation all environmental laws, ordinances, rules and regulations, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $1,000.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Borrower, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Borrower), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Agreement and this Agreement shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Agreement or of any note or other instrument or agreement evidencing the Indebtedness and the Collateral will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Agreement.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default in Favor of Third Parties.** Borrower or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The death of Borrower or Grantor or the dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or guarantor, endorser, surety, or accommodation party dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's or Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Illinois Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Borrower would be required to pay, immediately due and payable, without notice of any kind to Borrower or Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Illinois.**

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Agreement shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Agreement. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 310002115-1

Page 6

---

Waive Jury. All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

Agreement. The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

Borrower. The word "Borrower" means Good To Go Jamaican Cuisine LLC, Dennis A. Levy and Lenice D. Levy and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Collateral. The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

Environmental Laws. The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

Event of Default. The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

Grantor. The word "Grantor" means Good To Go Jamaican Cuisine LLC.

Guaranty. The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

Hazardous Substances. The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

Indebtedness. The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision of this Agreement together with all interest thereon.

Lender. The word "Lender" means Village Bank & Trust, N.A. its successors and assigns.

Note. The word "Note" means a Promissory Note dated November 1, 2023, as amended from time to time, in the original principal amount of $518,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or credit agreement.

Property. The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

Rents. The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**BORROWER AND GRANTOR HAVE READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREE TO ITS TERMS. THIS AGREEMENT IS DATED NOVEMBER 1, 2023.**

GRANTOR:

GOOD TO GO JAMAICAN CUISINE LLC

By: _____
Dennis A. Levy, Manager of Good To Go Jamaican
Cuisine LLC

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 310002115-1

Page 7

BORROWER:

GOOD TO GO JAMAICAN CUISINE LLC

By: _____
Dennis A. Levy, Manager of Good To Go Jamaican
Cuisine LLC

X _____
Dennis A. Levy, Individually

X _____
Lenice C. Levy, Individually

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

RECEIVED

IL SECRETARY OF STATE

UNIFORM COMMERCIAL CODE

20231107  1310
$20.00  Electronic

30116089                     FS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)
Corporation Service Company          800-858-5294

B. E-MAIL CONTACT AT SUBMITTER (optional)
FilingDept@cscinfo.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL  62703
USA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Good to Go Jamaican Cuisine LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 711 W Howard Street | Evanston | IL | 60202 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Village Bank & Trust, N.A. | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 234 West Northwest Highway | Arlington Heights | IL | 60004 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
ALL INVENTORY, CHATTEL PAPER, ACCOUNTS, EQUIPMENT, GENERAL INTANGIBLES AND FIXTURES;
WHETHER ANY OF THE FOREGOING IS OWNED NOW OR ACQUIRED LATER; ALL ACCESSIONS, ADDITIONS,
REPLACEMENTS AND SUBSTITUTIONS RELATING TO ANY OF THE FOREGOING; ALL RECORDS OF ANY KIND
RELATING TO ANY OF THE FOREGOING; ALL PROCEEDS RELATING TO ANY OF THE FOREGOING(INCLUDING
INSURANCE, GENERAL INTANGIBLES AND OTHER ACCOUNTS PROCEEDS

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor

8. OPTIONAL FILER REFERENCE DATA
[268697624]

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

EXHIBIT
E

EXHIBIT

F

# PROMISSORY NOTE

| Borrower: | Good to Go Jamaican Cuisine LLC | Lender: | Village Bank & Trust, N.A. |
|---|---|---|---|
| | 711 W. Howard Street | | 234 West Northwest Highway |
| | Evanston, IL 60202 | | Arlington Heights, IL 60004 |

Principal Amount: $75,000.00                                        Date of Note: November 1, 2023

**PROMISE TO PAY.** Good to Go Jamaican Cuisine LLC ("Borrower") promises to pay to Village Bank & Trust, N.A. ("Lender"), or order, in lawful money of the United States of America, the principal amount of Seventy-five Thousand & 00/100 Dollars ($75,000.00), together with interest on the unpaid principal balance from November 1, 2023, until paid in full.

**PAYMENT.** Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: 24 monthly consecutive interest payments, beginning December 5, 2023, with interest calculated on the unpaid principal balances using an interest rate based on the Prime rate as published from time to time in the Wall Street Journal (currently 8.500%), plus a margin of 1.250 percentage points, the sum rounded to the nearest 0.001%, resulting in an initial interest rate of 9.750%; 59 monthly consecutive principal and interest payments in the initial estimated amount of $1,648.32 each, beginning December 5, 2025, with interest calculated on the unpaid principal balances using an interest rate based on the Prime rate as published from time to time in the Wall Street Journal (currently 8.500%), plus a margin of 1.250 percentage points, the sum rounded to the nearest 0.001%, resulting in an initial interest rate of 9.750%; and one principal and interest payment of $4,309.37 on November 1, 2030, with interest calculated on the unpaid principal balances using an interest rate based on the Prime rate as published from time to time in the Wall Street Journal (currently 8.500%), plus a margin of 1.250 percentage points, the sum rounded to the nearest 0.001%, resulting in an initial interest rate of 9.750%. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the Index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the Prime rate as published from time to time in the Wall Street Journal (the "Index"). Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each calendar quarter reset on the first business day of each said quarter using the rate in effect on the first business day of the month in which an interest rate change occurs. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 8.500% per annum. The interest rate or rates to be applied to the unpaid principal balance during this Note will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Note, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the due date of the last payment in the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law. Whenever changes occur in the interest rate, Lender, at its option, may do one or more of the following: (A) change the amounts of Borrower's payments to maintain the original amortization schedule, (B) increase Borrower's payments to cover accruing interest if the interest rate adjustment is an increase, (C) change the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and change Borrower's final payment amount.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/365 simple interest basis; that is, by applying the ratio of the interest rate over the number of days in a year (365 for all years, including leap years), multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Village Bank & Trust, N.A., 234 West Northwest Highway Arlington Heights, IL 60004.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 2.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. After maturity, or after this Note would have matured had there been no default, the Default Rate Margin will continue to apply to the final interest rate described in this Note. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note.

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help,

**PROMISSORY NOTE**
**(Continued)**

Loan No: 310002116-3

repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**LINE OF CREDIT.** This Note evidences a revolving line of credit for twenty four (24) months from the Note date. Advances under this Note, as well as directions for payment from Borrower's account, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either, (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Illinois.

**CONFESSION OF JUDGMENT.** Borrower hereby irrevocably authorizes and empowers any attorney-at-law to appear in any court of record and to confess judgment against Borrower for the unpaid amount of this Note as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorneys' fees plus costs of suit, and to release all errors, and waive all rights of appeal. If a copy of this Note, verified by an affidavit, shall have been filed in the proceeding, it will not be necessary to file the original as a warrant of attorney. Borrower waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing warrant and power to confess judgment will be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void; but the power will continue undiminished and may be exercised from time to time as Lender may elect until all amounts owing on this Note have been paid in full. Borrower hereby waives and releases any and all claims or causes of action which Borrower might have against any attorney acting under the terms of authority which Borrower has granted herein arising out of or connected with the confession of judgment hereunder.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Village Bank & Trust, N.A. 234 West Northwest Highway Arlington Heights, IL 00004.

**SBA NOTE PROVISION.** When SBA is the holder, this Note will be interpreted and enforced under Federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any Federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt Federal law.

**DOCUSIGN PROVISION.** Each of the parties hereto agrees that this agreement and all other related documents may be entered into by means of (i) a DocuSign® electronic signature or another electronic signature that Lender accepts or (ii) manual signature. Each party agrees, and acknowledges that it is such party's intent, that if such party signs this agreement and/or all other related documents using an electronic signature, it is signing, adopting, and accepting this agreement and/or all other related documents and that signing this agreement and/or all other related documents using an electronic signature is the legal equivalent of having placed its handwritten signature on this agreement and/or all other related documents. The use of electronic signatures, records and transmissions (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

**PROMISSORY NOTE**
**(Continued)**

TRANSFERABLE RECORD. Borrower expressly agrees that this Note is a "transferable record" as defined in applicable law relating to electronic transactions and that it may be created, authenticated, stored, transmitted and transferred in a manner consistent with and permitted by such applicable law.

GENERAL PROVISIONS. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

ILLINOIS INSURANCE NOTICE. Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by their agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on Borrower's own.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

GOOD TO GO JAMAICAN CUISINE LLC

By: _____
Dennis A. Levy, Manager of Good to Go Jamaican
Cuisine LLC

EXHIBIT

G

# COMMERCIAL SECURITY AGREEMENT

| Grantor: | Good to Go Jamaican Cuisine LLC<br>711 W. Howard Street<br>Evanston, IL 60202 | Lender: | Village Bank & Trust, N.A.<br>234 West Northwest Highway<br>Arlington Heights, IL 60004 |

THIS COMMERCIAL SECURITY AGREEMENT dated November 1, 2023, is made and executed between Good to Go Jamaican Cuisine LLC ("Grantor") and Village Bank & Trust, N.A. ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles and Fixtures

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**FUTURE ADVANCES.** In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above, or at the location specified in the Collateral definition in this Agreement, or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 310002116-3

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Illinois, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $1,000.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-hearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing, such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however no more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Agreement and this Agreement shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Agreement or of any note or other instrument or agreement evidencing the Indebtedness and the Collateral will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Agreement.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: 310002116-3

Page 4

adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Illinois Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**SBA PROVISION.**

The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

a. When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b. Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 310002116-3                                                                                    Page 5

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Illinois.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Good to Go Jamaican Cuisine LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Good to Go Jamaican Cuisine LLC.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 310002116-3                                                                                      Page 6

Guarantor. The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

Guaranty. The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

Hazardous Substances. The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

Indebtedness. The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision of this Agreement together with all interest thereon.

Lender. The word "Lender" means Village Bank & Trust, N.A., its successors and assigns.

Note. The word "Note" means the Note dated November 1, 2023 and executed by Good to Go Jamaican Cuisine LLC in the principal amount of $75,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

Property. The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

Rents. The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED NOVEMBER 1, 2023.

GRANTOR:

GOOD TO GO JAMAICAN CUISINE LLC

By: _____
Danny A. Levy, Manager of Good to Go Jamaican
Cuisine LLC

EXHIBIT

H

## COMMERCIAL GUARANTY

**Borrower:** Good to Go Jamaican Cuisine LLC
711 W. Howard Street
Evanston, IL 60202

**Lender:** Village Bank & Trust, N.A.
234 West Northwest Highway
Arlington Heights, IL 60004

**Guarantor:** Dennis A. Levy
2006 Brummel Street
Evanston, IL 60202

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration. Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether, voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that: (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without

the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**CONFESSION OF JUDGMENT.** Guarantor hereby irrevocably authorizes and empowers any attorney-at-law to appear in any court of record and to confess judgment against Guarantor for the unpaid amount of this Guaranty as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorneys' fees plus costs of suit, and to release all errors, and waive all rights of appeal. If a copy of this Guaranty, verified by an affidavit, shall have been filed in the proceeding, it will not be necessary to file the original as a warrant of attorney. Guarantor waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing warrant and power to confess judgment will be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but the power will continue undiminished and may be exercised from time to time as Lender may elect until all amounts owing on this Guaranty have been paid in full. Guarantor hereby waives and releases any and all claims or causes of action which Guarantor might have against any attorney acting under the terms of authority which Guarantor has granted herein arising out of or connected with the confession of judgment hereunder.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

## COMMERCIAL GUARANTY
### (Continued)

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions.**

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty. Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require, and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**SBA Provision.** When SBA is the holder, the Note and this Guarantee will be interpreted and enforced under Federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any Federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claims of SBA, or preempt Federal law.

**THE FOLLOWING NOTICE IS REQUIRED BY ILLINOIS LAW:** Unless Guarantor provides Lender with evidence of the insurance coverage required by Guarantor's agreement with Lender, Lender may purchase insurance at Guarantor's expense to protect Lender's interests in the collateral. This insurance may, but need not, protect Guarantor's interests. The coverage that Lender purchases may not pay any claim that Guarantor makes or any claim that is made against Guarantor in connection with the collateral. Guarantor may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Guarantor has obtained insurance as required by their agreement. If Lender purchases insurance for the collateral, Guarantor will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Guarantor's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Guarantor may be able to obtain on Guarantor's own.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Good to Go Jamaican Cuisine LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Dennis A. Levy, and in each case any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means Village Bank & Trust, N.A., its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED NOVEMBER 1, 2023.

GUARANTOR:

X _____
Dennis A. Levy



## WINTRUST
### COMMUNITY BANKS

### APPROVAL LETTER

January 5, 2024

GOOD TO GO JAMAICAN CUISINE LLC
Attn: DENNIS A LEVY
711 HOWARD ST
EVANSTON, IL 60202

**Re:  Business Revolving Line of Credit**
   **Account #00430004546 -00001**

We are pleased to inform you that your Business Revolving Line of Credit has been approved by Wintrust Bank, N.A. Here are key terms of your account:

| | |
|---|---|
| Loan or Credit Line Amount: | $50,000.00 |
| Your Interest Rate: | WSJ_Prime +2.50% for 12 months, with a floor rate of 5.99%. |
| Closing Fee: | $150.00 |
| Annual Fee: | $50.00 (To be debited from primary operating account annually) |
| Payment Due Date: | 15th of the month, and the same day of each subsequent month |
| Maturity Date: | 12/15/2024 |
| Security: | Unsecured |
| Contact Us: | 231 South LaSalle Street, Chicago, Illinois 60604 |
| | (312) 291-2900 |

The following documentation is included with this Approval Letter:

- Guaranty
- Business Revolving Line of Credit Loan Agreement (outlines terms and conditions of the loan)
- Privacy Policy

Please review these documents and keep them for your records.

We value your business and appreciate the opportunity to service your business banking needs. If you have any questions, please call me at (773) 267-2701.

Sincerely,
Steve Jang
Relationship Manager



By signing below: (i) I authorize the bank to automatically deduct from my depository account indicated below, the minimum amount as defined in SECTION 9 of Business Revolving Line of Credit Agreement; (ii) I acknowledge and confirm that I am an authorized signer on the depository account from which I am making payment (iii) I acknowledge that I have read and understand all provisions of the Business Revolving Line of Credit Agreement and agree to the terms of the approval letter.

| Bank Name: Wintrust Bank, N.A. | Routing Number: 071925444 | Account Number: 3805353004 |
|---|---|---|



Borrower Acknowledgement:

Dennis Levy



MEMBER FDIC

EQUAL HOUSING LENDER



## BUSINESS REVOLVING LINE OF CREDIT AGREEMENT

**This Business Revolving Line of Credit Agreement governs the business revolving line of credit account with Wintrust Bank, N.A. (the "Bank").**

SECTION 1. Definitions. The following definitions apply: "Account" means the revolving line of credit account issued by Bank to Customer. "Agreement" means this Business Revolving Line of Credit Agreement, as well as the application ("Application") and the approval letter sent to you regarding the revolving line of credit account ("Approval Letter"), both of which are incorporated by reference. "Credit Limit" means the maximum amount of credit as set forth in the Approval Letter, which amount may be hereafter changed by Bank from time to time. "Customer" means the business entity or sole proprietorship named in the Application. "Deposit Account" means Customer's account at Bank designated in this Application as the account to be debited by Bank for payments due under this Agreement, as well as the deposit account to be credited with any Advances made under this Agreement. "Guarantor" means the person (or persons) who sign(s) the Guaranty on behalf of Customer and is(are) responsible for repayment of Customer's obligations under this Agreement. "Advance" means an advances from the Account made by Bank under this Agreement.

SECTION 2. Agreement. Customer's signature on the Application or use of the Account constitutes Customer's agreement to the terms of this Agreement. An electronic, microfilm, facsimile, microfiche, or optical image copy of this Agreement shall have the same validity as an original. Customer agrees to repay Bank for all credit extended by Bank in connection with this Agreement, together with all applicable interest, fees, and charges as set forth in this Credit Agreement.

SECTION 3. Obtaining an Advance. Customer may obtain an Advance by using Bank's online banking system to request an Advance to the Deposit Account, and by other methods, as may be offered by Bank from time to time. Customer will not request an Advance that, when taken together with other amounts then outstanding in the Account, would exceed the Credit Limit. If Bank makes an Advance that causes the balance of the Account to exceed the Credit Limit, that amount in excess of the Credit Limit will be immediately due and payable. Bank is under no obligation to make an Advance in excess of the Credit Limit, and the fact that Bank makes such an Advance will not preclude Bank from declining such a requested Advance in the future.

SECTION 4. Business Purpose. Customer agrees that this Account and any Advances provided by Bank under this Agreement are solely for business or commercial purposes and not for personal, family or household purposes.

SECTION 5. Revolving Advance. Each Advance is an advance on the Account. Customer must repay principal and interest, fees and charges, subject to the terms of this Agreement. If any Advance principal is repaid, Customer may reborrow, subject to the terms of this Agreement. Customer agrees not to request an Advance from the Account to pay Bank for any amounts due under this Agreement.

SECTION 6. Interest Rate. INTEREST ON THE ACCOUNT WILL BE CHARGED AT THE RATE SET FORTH IN THE APPROVAL LETTER. EACH ADVANCE WILL CONTINUE TO ACCRUE INTEREST AS PROVIDED IN THIS AGREEMENT UNTIL PAID IN FULL. NOTWITHDSTANDING FOR FLORIDA BASED CUSTOMERS, THE INTEREST RATE CHARGED ON THE ACCOUNT SHALL NOT EXCEED 18.00%." Interest is calculated on a 365/360

day basis, that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of calendar days the principal balance is outstanding. All interest due under this Agreement is calculated using this method. Interest begins to accrue on the date an Advance is posted to the Account. If the interest rate in the Approval Letter is stated as "Prime" plus a percentage amount, then this is a variable rate loan and the interest rate is determined by adding the specified percentage amount to the Prime Rate. The Prime Rate is the highest U.S. Prime Rate published in the Money Rates table of The Wall Street Journal each day. For any day on which no U.S. Prime Rate is published in The Wall Street Journal, Bank uses the applicable rate published on the prior publication date.

SECTION 7. Default Interest. If Customer does not make any payment when due under this Agreement, or if there is any Event of Default (as defined below), then the applicable interest rate may be increased by Bank by an additional 6% per annum. The increased rate will remain in effect indefinitely, and apply to existing Advances and new Advances. The interest rate payable under this Agreement shall never exceed the highest rate that Customer may contract to pay under applicable law.

SECTION 8. Other Fees. CUSTOMER AGREES TO PAY THE FOLLOWING FEES: CLOSING FEE. A closing fee in an amount set forth in the Approval Letter will be due prior to the establishment of the Account. ANNUAL FEE. An annual fee in an amount set forth in the Approval Letter will be due on the first anniversary of the Account being established, and each successive anniversary. LATE PAYMENT FEE. Each time Customer fails to make the periodic payment within ten (10) calendar days after the payment due date, Customer shall be charged a late payment fee. If the tenth calendar day falls on a Saturday, Sunday or a day on which Bank is closed, the late payment fee will be charged on the next calendar day the Bank is open.   The late payment fee is 5% of the delinquent payment amount or $25.00, whichever is greater. RETURNED PAYMENT FEE. If Customer makes a payment that is returned unpaid for any reason, Customer shall be charged a returned payment fee of $30.00. Bank may assess this fee the first time the payment is not honored, even if it is paid upon resubmission. All of these fees may be charged by Bank to the Account.

SECTION 9. Payments. Customer is required to make periodic payments each month on the Payment Due Date specified in the Approval Letter. Customer authorizes Bank to deduct or withdraw funds from the Deposit Account with Bank, to satisfy amounts owing under this Agreement, on each due date (or, if the Payment Due Date falls on a Saturday, Sunday or a day on which Bank is closed, Customer authorizes the Bank to deduct or withdraw funds on the next calendar day the Bank is open). MINIMUM PAYMENTS. The minimum payment will equal the accrued interest during the statement period cycle, plus any unpaid fees and charges, plus any past due amounts. Customer must make at least the minimum payment by the payment due date as shown on the period statement. PAYMENTS MADE. In addition to automatic payments described above, Customer may make payments at the address of Bank set forth in the Approval Letter by check, payable to the order of Bank. Payments can also be made using Bank's online banking system, or by telephone. PREPAYMENT. Customer may pay the entire balance of the Account at any time without penalty. DISPUTED PAYMENTS. Customer agrees not to send payments marked "paid in full," "without recourse," or similar language. If Customer sends such a payment, Bank may accept it without losing any of Bank's rights under this Agreement and Customer will remain obligated to pay all amounts owed to Bank. All written communication concerning disputed amounts including any check that indicates that the payment constitutes "payment in full" of the amount owed as full satisfaction of the disputed amount shall be mailed or delivered to Bank at the address set forth in the Approval Letter to the attention of Loan Operations. If Customer pays more than the minimum payment, Customer is still required to make future minimum payments.

SECTION 10. Crediting Payments. Payments received by Bank shall be applied first to accrued interest, then to principal, and then to other fees and charges, provided that during the existence of any Event of Default all payments received may be applied in such order and manner as Bank shall determine. If any payment from Customer becomes due on a Saturday, Sunday or a day on which Bank is closed, such payment shall be made on the next calendar day the Bank is open and any such extension shall be included in computing interest under this Agreement.

SECTION 11. Periodic Statements. Bank will furnish Customer with a statement for each monthly billing period which has any transaction or balance greater than one dollar ($1). The statement contains important information and should be carefully read and reviewed each time a statement is received. Unless Customer notifies Bank of any purported mistake or error within sixty (60) calendar days of receipt of a statement, the statement will be conclusively deemed to be correct.

SECTION 12. Customer Financial Statement and Other Obligations. Customer agrees to furnish such information respecting the business, assets, and financial condition of Customer as Bank may reasonably request from time to time. This information may include, with limitation, Customer's financial statements, tax returns, formation documents, and any business licenses. Customer shall furnish such information as soon as possible, but in any event within thirty (30) calendar days after request. Customer agrees to notify Bank promptly, in writing, if Customer experiences (i) any material change in its financial condition; (ii) any change in ownership; or (iii) any address changes. Customer agrees that Bank at its discretion may obtain a credit bureau report on Customer and Guarantor(s) in order to evaluate Customer's eligibility and continuing eligibility for an Account. Customer also agrees that Bank may exchange information about Customer and Guarantor(s) and their obligations under this Agreement with Customer references, other businesses (including affiliates of Bank), or any Guarantor(s), and credit reporting agencies. Bank may confirm any information provided by Customer or Guarantor(s).

SECTION 13. Representation and Warranties. In consideration of establishing and maintaining this Agreement, Customer hereby represents and warrants to Bank that: (a) Customer is either a sole proprietorship or is a business entity (a corporation, partnership, limited partnership, non profit, or limited liability company), as reflected on the Application, duly organized, validly existing, and in good standing under the laws of its state of organization; (b) the acceptance, delivery, and performance by Customer of this Agreement are within its organizational powers, as applicable, have been duly authorized by all necessary action required to be taken, and do not contravene Customer's organizational documents or agreements or any law or contractual restriction binding on or affecting Customer; (c) no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for Customer's due execution, delivery, and performance of this Agreement; (d) this Agreement is, when the Account is approved by Bank and Customer signs and delivers this Agreement or uses the Account, Customer's legal, valid, and binding obligation enforceable against Customer in accordance with its terms; (e) Customer is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System), and no proceeds of any Advance will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock; (f) the Application and, if furnished to Bank, Customer's most recent balance sheet and the related statements of income and retained earnings, fairly present Customer's financial condition as of such date and result of the operations, all in accordance with generally accepted accounting principles consistently applied, and since the Application date there has been no material adverse change in Customer's condition or operations; and (g) Customer's taxes are current, Customer is not in default with any other creditors and there is no pending or threatened action or proceeding affecting Customer before any court, governmental agency or arbitrator, which may materially adversely affect Customer's financial condition or operations or which purports to affect the legality, validity or enforceability of this Agreement.

SECTION 14. Security. To secure the payment of the Account and all Advances (both for principal and interest) and any and all other liabilities of Customer to Bank, whether now existing or hereafter arising and howsoever evidenced or acquired, whether absolute or contingent (including indebtedness of others guaranteed by Customer) and whether several, joint, or joint and several, Customer hereby grants a security interest to Bank in all cash, deposits, investment property, and all other property of Customer of any kind or description, now or at any time hereafter transferred or delivered to or left in or coming into the possession, control or custody of Bank or its affiliates by or for the account of Customer, whether expressly as collateral security or for any other purpose, and all interest, income, dividends, distributions, and sums distributable or payable from, upon, or in respect of any such property, and all other rights and privileges incident to such property, and all

proceeds of the foregoing. Customer agrees to deliver to Bank, upon its request, any such interest, income, dividends, distributions and sums that may at any time come into the possession of Customer. Customer also agrees that each affiliate of Bank which holds any deposit account of Customer is irrevocably authorized and directed to honor all instruction and direction from Bank regarding such account(s) and the balances on deposit therein from time to time without further consent of Customer. Customer further agrees on request of Bank to execute a written agreement with each such depository institution to confirm Bank's power and authority regarding such accounts.

SECTION 15. Right of Setoff. To the extent permitted by applicable law, whether or not an Event of Default exists and whether or not the Account or any Advance is then due or payable, Bank reserves a right of setoff in all Customer's accounts with Bank (whether checking, savings, or some other account). This includes all accounts Customer may open in the future. Customer authorizes Bank, to the extent permitted by applicable law, to charge and setoff all amounts owing under this Agreement against all such accounts and, at Bank's option, to administratively freeze all such accounts to allow Bank to protect Bank's setoff rights provided in this section.

SECTION 16. Events of Default. The occurrence of any of the following shall be an "Event of Default": (a) nonpayment when due of any amount payable under this Agreement, or nonpayment when due of any other indebtedness or liabilities of Customer owing to Bank or any other lender; (b) failure of Customer to furnish Bank with any financial or other information on Customer within thirty (30) calendar days after request therefore as provided in Section 12; (c) breach of any term or condition of this Agreement or any other agreement with Bank, or any representation made by Customer or any Guarantor in any such agreement is untrue in any material respect; (d) failure of Customer to notify Bank of a change of address; (e) closure (whether voluntary or involuntary) of Customer's Deposit Account with Bank; (f) dissolution, termination, insolvency, retirement, disability, or death of any principal of Customer or of any Guarantor; (g) the institution by or against Customer or Guarantor of any bankruptcy or similar proceeding for the relief of debtors or the appointment of any receiver for any such party or any of its property; (h) the making of an assignment for the benefit of creditors, a garnishment against Customer, or the existence of any tax lien, levy or similar process on or with respect to any property of Customer or Guarantor; (i) any creditor tries to take any of Customer's property on or in which Bank has a lien or security interest, including any garnishment of any account with Bank; (j) change in the management or ownership of Customer; or (k) change in the condition (financial or otherwise) or operating results of Customer or Guarantor or in the value of any collateral that Bank in good faith deems material and adverse occurs in.

SECTION 17. Bank's Rights upon Default and Maturity. Upon the occurrence of any Event of Default or the Maturity Date, (a) unless Bank elects otherwise in writing, the entire unpaid balance of the Account and all advances under this Agreement including interest and other fees and charges shall be immediately due and payable by Customer without notice to Customer and without protest, presentment or demand, all of which are expressly waived by Customer; (b) if the Agreement and Advances are secured by property Bank may exercise all of the rights and remedies of a secured party under the Uniform Commercial Code ("UCC") or other applicable law; (c) the obligation of Bank to extend further credit shall immediately terminate; (d) Bank may change the terms of this Agreement; and (e) Bank shall have the right, at any time, to setoff the balance of the Deposit Account and any account that Customer may at any time maintain with Bank (or its affiliates) against any amounts at any time owing under this Agreement, whether or not the balance of the Account is then due as described in Section 15.

SECTION 18. Waiver. No delay by Bank in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Bank of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. Customer and any Guarantors waive the rights to presentment, notice of dishonor and protest.

SECTION 19. Termination. This Agreement shall terminate on the earlier of the Maturity Date set forth in the Approval Letter, or upon the occurrence of an Event of Default. Prior to the Maturity Date, Bank may renew this Agreement for an

additional term, by providing notice to Customer. However, Bank may terminate or suspend this Agreement at any time. Customer may terminate this Agreement at any time, effective upon receipt by Bank of at least seven (7) calendar days prior written notice and payment in full of all sums due under this Agreement. Upon termination, Customer agrees to cease using the Account. Bank retains all rights under this Agreement and termination or cancellation of the Account does not affect (i) the terms of this Agreement which remain in effect until the Loans are paid in full, or (ii) Customer's liability for payment of amounts owed on the Account according to the terms of this Agreement. Requests for Advances made after termination of this Agreement will not be accepted.

SECTION 20. Notices. Bank may rely on instructions from Customer with respect to any matters relating to this Agreement and the Account, including telephone loan requests which are made by a person whom Bank believes to be Customer or its designated representative. All notices and statements to be furnished by Bank shall be sufficient if delivered to any such person at the billing address for Customer shown on the records of Bank. All notices from Customer shall be sent to Bank at the address set forth in the Approval Letter. This Agreement (including the documents incorporated by reference) constitutes the entire understanding of the parties with respect to the subject matter hereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby. No amendment or waiver of any provision of this Agreement, nor consent to any departure by Customer there from, shall in any event be effective unless the same shall be in writing and signed by Bank.

SECTION 21. Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of Illinois. This Agreement has been accepted by Bank in the State of Illinois. If any part of this Agreement is unenforceable, that will not make any other part unenforceable.

SECTION 22. Consent to Jurisdiction. Customer submits to the nonexclusive jurisdiction of any state or federal court jurisdiction in Cook County, Illinois for purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby.

SECTION 23. Jury Trial Waiver. Customer and Bank waive any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

SECTION 24. Attorney's Fees; Expenses. Bank may hire someone else to help collect amounts due under this Agreement, if Customer does not pay. Customer will pay Bank, subject to any limits under applicable law, Bank's collection expenses, attorney's fees and legal expenses, whether or not a lawsuit is instituted and including attorney's fees and expenses for bankruptcy proceedings and appeals. Customer will also pay court costs, in additional to all other amounts permitted by law.

SECTION 25. Amendment. Bank may amend this Agreement by written notice to Customer. Any amendment to this Agreement shall be effective thirty (30) calendar days after notice of such amendment is sent to Customer, unless Customer objects to such amendment, in which event this Agreement shall automatically terminate on the thirtieth (30th) day following receipt of Customer's objection. The terms of this Agreement shall remain in effect, however, with respect to any amounts owed by Customer at the time of termination.

SECTION 26. Assignment. This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective legal representatives, successors and assigns, but not for the benefit of any other person. Customer may not assign this Agreement. Bank may assign this Agreement, or any of its rights hereunder, in whole or in part.

SECTION 27. Additional Security. This Section 27 is applicable to Customer only if the Approval Letter provides that Section 27 – Additional Security is applicable to the Account. In this Section 27, "Collateral" means all inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment

property, fixtures, goods, commercial tort claims, cash, cash equivalents and money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property. Customer hereby grants to Bank, its successors and assigns, a security interest in all of Customer's Collateral, and all proceeds of any of the Collateral, including all rights to, in and under, and all amounts or property payable to or received or receivable by Customer under or in connection with, any lease, contract, sale, exchange, insurance policy, condemnation or requisition proceeding, or other voluntary or involuntary disposition or loss thereof (but the foregoing shall not imply any authorization for any such sale or disposition without Bank's consent), to secure any and all amounts due from Customer to Bank in respect of this Agreement. Notwithstanding the foregoing, the term "Collateral" shall not include any rights under any account, contract, license or other general intangible that by the terms thereof, or under applicable law, cannot be assigned or a security interest granted therein in the manner contemplated by this Agreement unless consent from the relevant account debtor or other party has been obtained or under the terms of which any such assignment or grant of a security interest therein in the absence of such consent would, or could, result in the termination of the obligations of such account debtor or other party with respect thereto, but only to the extent that (y) such rights are subject to such contractual or legal restriction and (z) such restriction is not, or could not be, rendered ineffective pursuant to the UCC of any relevant jurisdiction or any other applicable law (including the United States Bankruptcy Code) or principles of equity; provided that, upon the termination or lapse of any such restriction with respect to any such account, contract or other general intangible, Customer shall, automatically and without the necessity of any further action on the part of Customer or any other person, be deemed to have granted to Bank a security interest in and lien upon all of Customer's right, title and interest in and to such account, contract or other general intangible and the same shall constitute Collateral hereunder, all as if such restriction had never been effective; and provided further that nothing in this paragraph shall limit or restrict the assignment or grant of a security interest by Customer in any proceeds of any such account, contract or other general intangible. Non-capitalized terms used herein are used as defined in the Uniform Commercial Code and as in effect on the date hereof to the extent that they are defined therein.

CUSTOMER WARRANTS: (a) Customer is the owner of the Collateral free and clear of all liens and security interests except the security interest granted hereby; (b) Customer has the right to make this agreement; and (c) the Collateral is purchased for use primarily for business purposes and not for personal, family or household purposes.

CUSTOMER AGREES that it:

i. Will pay Bank all amounts payable mentioned above and all other liabilities and indebtedness due to Bank as and when the same shall be due and payable, and will perform all terms of agreements and other documents evidencing such liabilities and indebtedness and this and any other security agreement between Customer and Bank, and will discharge all said liabilities and indebtedness.

ii. Will defend the Collateral against the claims and demands of all persons.

iii. Will insure the Collateral against all hazards requested by Bank in form and amount satisfactory to Bank. If Customer fails to obtain insurance, Bank shall have the right to obtain it at Customer's expense. Customer assigns to Bank all

right to receive proceeds of insurance not exceeding the unpaid balance of all accounts payable due to Bank, directs any insurer to pay all proceeds directly to Bank, and authorizes Bank to demand, collect, settle and receipt for any insurance proceeds, and to endorse any draft payable to Customer therefor.

iv. Will keep the Collateral in good condition and repair, reasonable wear and tear excepted, and will permit Bank and its agents to inspect the Collateral at any time.

v. Will pay as part of the liabilities hereby secured all amounts, with interest thereon, paid by Bank (a) for taxes, levies, insurance, repairs to, or maintenance of the Collateral, and (b) in taking possession of, disposing of or preserving the Collateral after any default hereinafter described.

vi. Will not permit any of the Collateral to be removed from the above mentioned location without the prior written consent of Bank.

vii. Will immediately advise Bank, in writing, of any change in any of Customer's places of business or the opening of any new place of business.

viii. Will not (a) permit any liens or security interests to attach to any of the Collateral; (b) permit any of the Collateral to be levied upon under any legal process; (c) dispose of any of the Collateral without the prior written consent of Bank; (d) permit anything to be done that may impair the value of any of the Collateral or the security intended to be afforded by this agreement; or (e) permit the Collateral to be so affixed or related to realty as to be a part thereof or to become accession to other goods.

ix. Will (a) preserve its existence as a business entity and not, in one transaction or a series of related transactions, merge into or consolidate with any other entity, or sell all or substantially all of its assets; and (b) not change its jurisdiction of organization.

x. Hereby irrevocably appoints Bank the attorney-in-fact of Customer to do all acts and things which Bank may deem necessary to perfect, and continue perfected the security interest created by this security agreement, to protect the Collateral, to collect insurance proceeds, and to do all other acts which Bank is hereunder authorized to do.

UNTIL DEFAULT Customer may retain possession of the Collateral and use it in any lawful manner not inconsistent with the agreement herein, or with the terms and conditions of any policy of insurance thereon.

UPON DEFAULT by Customer in the performance of any covenant or agreement herein or in the discharge or payment of any liability to Bank, or if any warranty should prove untrue, without notice or demand or judicial proceedings Bank may, without a breach of the peace, enter any premises where any of the Collateral may be, take possession of it, and in general Bank shall have all of the rights and remedies of a secured party under the Uniform Commercial Code or other applicable law and all rights provided herein, or in any other applicable security, all of which rights and remedies shall, to the full extent permitted by law, be cumulative. Ten (10) calendar days prior written notice by facsimile, electronic mail or certified mail of any proposed disposition of the Collateral shall be reasonable notice thereof. The waiver of any default hereunder shall not be a waiver of any subsequent default.

To the extent permitted by applicable law, Customer hereby authorizes Bank to file one or more financing statements, continuations thereof or amendments thereto, disclosing the security interest granted to Bank under this Section without Customer's signature appearing thereon. Customer agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement.

DocuSign Envelope ID: 63E5965F-CE07-44DF-AD9E-727D...

All rights of Bank in this Section 27 shall inure to the benefit of its successors and assigns; and all obligations of Customer shall bind its heirs, executors, administrators, successors and assigns.

RECEIVED

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

IL SECRETARY OF STATE

UNIFORM COMMERCIAL CODE

| A. NAME & PHONE OF CONTACT AT SUBMITTER (optional) | |
| Corporation Service Company | 800-858-5294 |

20240607   0822

$20.00   Electronic

B. E-MAIL CONTACT AT SUBMITTER (optional)
FilingDept@cscinfo.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**30773330**                                    FS

Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703
USA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 13 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME
GOOD TO GO JAMAICAN CUISINE LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 711 W. HOWARD STREET | EVANSTON | IL | 60202 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 13 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME
VILLAGE BANK & TRUST, N.A.

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 234 W. NORTHWEST HIGHWAY | ARLINGTON HEIGHTS | IL | 60004 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
ALL INVENTORY, CHATTEL PAPER, ACCOUNTS, EQUIPMENT, GENERAL INTANGIBLES AND FIXTURES;
WHETHER ANY OF THE FOREGOING IS OWNED NOW OR ACQUIRED LATER; ALL ACCESSIONS, ADDITIONS,
REPLACEMENTS AND SUBSTITUTIONS RELATING TO ANY OF THE FOREGOING; ALL RECORDS OF ANY KIND
RELATING TO ANY OF THE FOREGOING; ALL PROCEEDS RELATING TO ANY OF THE FOREGOING(INCLUDING
INSURANCE, GENERAL INTANGIBLES AND OTHER ACCOUNTS PROCEEDS)

5. Check only if applicable and check only one box. Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box.
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box.
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor

8. OPTIONAL FILER REFERENCE DATA
[285073382]

**EXHIBIT**
J

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)



COMMUNITY BANKS

GUARANTY



**Borrower:**
GOOD TO GO JAMAICAN CUISINE LLC
711 HOWARD ST
EVANSTON, IL 60202

**Bank:**
Wintrust Bank, N.A.
231 South LaSalle Street
Chicago, Illinois 60604

**Guarantor:**
DENNIS A LEVY
2006 BRUMMEL ST
EVANSTON, IL 60202

**Account:**
Loan Number:    00430004546 - 00001
Loan Amount:    $50,000.00

(A) AS AN INDUCEMENT TO Wintrust Bank, N.A. ("BANK") TO ENTER INTO THIS AGREEMENT, THE BUSINESS PRINCIPAL, OTHER PERSON, OR ENTITY THAT EXECUTES THIS GUARANTY (THE "GUARANTOR") AGREES TO GUARANTEE THE OBLIGATIONS OF BORROWER ON A JOINT, SEVERAL AND UNLIMITED BASIS, AGREES TO PAY TO BANK PROMPTLY WHEN DUE, OR UPON DEMAND, WITHOUT DEDUCTION FOR ANY CLAIM OF SET OFF OR COUNTERCLAIM OF BORROWER OR ANY OTHER DEFENSE, THE FULL AMOUNT OF ALL INDEBTEDNESS DUE TO BANK FROM BORROWER, INCLUDING ADVANCES, APPLICABLE FEES AND INTEREST, TOGETHER WITH ALL EXPENSES OF COLLECTION AND REASONABLE ATTORNEY FEES INCURRED BY BANK BY REASON OF THE DEFAULT OF BORROWER. (B) THE GUARANTOR AGREES THAT BANK IN ITS DISCRETION MAY OBTAIN A CREDIT BUREAU REPORT ON THE GUARANTOR IN ORDER TO EVALUATE BORROWER'S ELIGIBILITY FOR ADVANCES UNDER THIS AGREEMENT, AND IN CONNECTION WITH THE ONGOING REVIEW, SERVICING, OR COLLECTION OF THE ACCOUNT. THE GUARANTOR ALSO AGREES THAT BANK MAY EXCHANGE INFORMATION ABOUT THE GUARANTOR AND HIS/HER OBLIGATIONS UNDER THIS AGREEMENT WITH BORROWER, REFERENCES, OTHER BUSINESSES (INCLUDING AFFILIATES OF BANK), AND CREDIT REPORTING AGENCIES AND MAY CONFIRM ANY INFORMATION PROVIDED BY OR ABOUT THE GUARANTOR. (c) Guarantor waives notice of acceptance, and notice of all Advances to Borrower and of the settlement or adjustment of defaults or disputes. Guarantor, without affecting his/ her liability in any respect, consents to and waives notice of all changes of terms, the withdrawal or extension of credit or time to pay, the release of the whole or any part of the indebtedness, the settlement or compromise of differences, the acceptance or release of security, the acceptance of notes, trade acceptances or any other form of obligation for Borrower's indebtedness, and the demand, protest and notice of protest of such instruments or their endorsements. Guarantor also consents to and waives notice of any arrangements or settlements made in or out of court in the event of receivership, liquidations, readjustment, bankruptcy, reorganization, arrangement or assignment for the benefit of creditors of Borrower, and anything whatsoever, whether or not herein specified, which may be done or waived by or between Bank and Borrower. (d) The obligation of Guarantor is a primary and unconditional obligation, and covers all existing and future indebtedness of Borrower to Bank. This obligation shall be enforceable before or after proceeding against Borrower or against any security held by Bank and shall be effective regardless of the solvency or insolvency of Borrower at any time, the extension or modification of the indebtedness of Borrower by operation of law, or the subsequent incorporation, reorganization, merger, or consolidation of Borrower, or any other change in Borrower. (e) The Guaranty will take effect when Bank approves the Account and will remain in force until all indebtedness is paid in full. (f) All liabilities of Borrower and of Guarantor shall mature immediately upon the insolvency of Borrower, the inability of Borrower to meet its obligations as they become due, the appointment of a receiver, custodian or trustee for Borrower or any of its property, the filing of a voluntary or involuntary petition

for relief in bankruptcy, reorganization, or arrangement, the making of an assignment for the benefit of creditors, or the calling of a meeting of creditors by Borrower, or if any of these events occur with respect to Guarantor. (g) Nothing herein shall be construed as an obligation on Bank's part to extend credit to Borrower, or as an obligation to continue to extend credit. Bank's records showing the Account between Bank and Borrower shall be admissible in evidence in any action or proceeding involving this Guaranty, and the records shall be prima facie proof of the items therein set forth. This Guaranty shall for all purposes be deemed to be made in and shall be governed by the laws of the State of Illinois. (h) This Guaranty shall be binding upon Guarantor, his or her legal representatives, successors and assigns, and shall inure to the benefit of Bank and its successors and assigns. (i) I agree that bank may enforce any remedy available to it under the Business Installment Loan Agreement against me as Guarantor, including the right to set off all my accounts.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREE TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN SECTION (e). NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED: January 5, 2024

*GUARANTOR:*

*Signature:*

Dennis Levy

*DENNIS A LEVY*

 AmTrust North America

AmTrust North America
Post Office Box 89404 • Cleveland, OH 44101
(p) 888.239.3909 • (f) 678.258.8985
Email: amtrustclaims@amtrustgroup.com

January 31, 2025

Good to Go Jamaican Cuisine LLC
711 Howard Street
Evanston IL 60202

Re:  Insurance Co.:       Wesco Insurance Company
     File No.:            3939554
     Policyholders:       Good to Go Jamaican Cuisine LLC
     Policy No.:          WBP2042780-00
     Policy Period:       5/14/2024 – 5/14/2025
     Date of Loss:        11/30/2024
     Location of Loss:    711 Howard Street, Evanston IL

Dear Good to Go Jamaican Cuisine LLC:

AmTrust North America is the claims administrator for Wesco Insurance Company, the commercial property insurance carrier for Good to Go Jamaican Cuisine LLC. We have received your claim for damage due to fire at the above listed location. Please be advised that we have completed our review of this matter and have determined that it is not covered under your policy for the reasons explained below.

As a condition of your insurance, you are required to maintain the protective devices or services outlined in your policy. We have been advised by your public adjuster that you are unable to document that the fire suppression system in the vent hood was being inspected, tested and serviced on a semi-annual basis by a licensed fire protection contractor. Accordingly, we hereby disclaim coverage for all costs associated with the fire damage to the building, business personal property and loss of income.

We refer you to the following relevant provisions contained in the **BP990026 02/23 PROTECTIVE SAFEGUARDS LIMITATIONS** endorsement which states, in part:

*A. The following is added to the Property General Conditions in Section 1 – Property::
Commercial Property Conditions*
> **PROTECTIVE SAFEGUARDS**
> *1. As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.*
> *2. The protective safeguards to which this endorsement applies are identified by the following symbols:*
>> *e."P-5" Automatic Commercial Cooking Exhaust And Extinguishing System, installed on cooking appliances and having the following components:*
>> *Automatic Sprinkler System means:*


EXHIBIT

3939554                                                      Page 2
January 31, 2025

    (1) Hood;
    (2) Grease removal device;
    (3) Duct system; and
    (4) Wet chemical fire extinguishing equipment.
   f. "P-9" The protective system described in the Schedule:

## DESCRIPTION Of "P-9" If Applicable:
P-9 / Contracts and Service Agreements
The following contracts and service agreements are considered to be on file:
  * Contract with a qualified and licensed contractor for the inspection and cleaning of the
vent hood and related ductwork, in the kitchen area, on a quarterly schedule (every three
months); to reduce the risk of the fire due to grease accumulation.
  * Contract with a licensed fire protection contractor to inspect, test and service the
automatic fire suppression system in the vent hood, on a semi-annual (every six months)
basis.
  * Fire extinguishers are to be placed on annual (once a year) service and maintenance
contract.

B. The following is added to Paragraph B. Exclusions in Section 1- Property:

  1. We will not pay for loss or damage caused by or resulting from fire if, prior to the
    fire, you:
    a. Knew of any suspension or impairment in any protective safeguard listed in the
    Schedule above and failed to notify us of that fact; or
    b. Failed to maintain any protective safeguard listed in the Schedule above, and
    over which you had control, in complete working order.

If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing
conditions or opening of sprinkler heads, notification to us will not be necessary if you can
restore full protection within 48 hours.

We again refer you to your **BP0003 01/06 Businessowners Coverage Form**, which
states in relevant part:

## E.  Property Loss Conditions
    4. Legal Action Against Us
    No one may bring a legal action against us under this insurance unless:
      a. There has been full compliance with all of the terms of this insurance;
      and
      b. The action is brought within 2 years after the date on which the direct
      physical loss or damage occurred.

3939554                                                            Page 3
January 31, 2025

This letter and our actions to date in investigating this matter do not constitute a waiver
of any policy provisions or defenses available to us. We reserve our rights to amend, alter
or supplement this letter should information become known in the future that would affect
the content of this letter.

If any of the factual information relied upon by us in this letter is inaccurate in any way,
please advise us immediately in writing. To the extent you disagree with this decision, we
encourage you to provide any information or documents you believe necessary to ensure
that Wesco Insurance Company makes a fully informed decision regarding your claim.
Please understand that various policy provisions may apply should additional information
come to light, and Wesco Insurance Company must reserve its rights accordingly.

Part 919 of the Rules and Regulations of the Illinois Department of Financial and
Professional Regulation, Division of Insurance, requires we advise you that if you wish to
pursue this matter with the Illinois Department of Financial and Professional Regulation,
Division of Insurance, you may contact them at the James R. Thompson Center, 100
West Randolph, Suite 9-301, Chicago, IL, 60601-3251 or at 320 West Washington, 4th
Floor, Springfield, IL  62767

Very truly yours,

*George Long*

George Long
Claims Adjuster III
Property Claims Department
O 857.269.3514
George.Long@AmTrustGroup.com

cc:    Jos Cacciatore & Co Insurance Agency Inc
       527 S Wells St #60
       Chicago IL 60607

       Alpha Adjusting – Dorian Bezanis via email:  Dorian@Alphaadjusting.com



# Jerk-Yard takes Good to Go space with grand opening Sunday

by Margo Milanowski
July 2nd, 2025

Jerk-Yard Bar and Grill, a small but growing chain of family friendly sports-bar style Jamaican restaurants, will host a grand opening Sunday in the reimagined space that previously held Good to Go Jamaican at 711 Howard St.

The owners of Good to Go, which closed after a fire devastated the restaurant's kitchen, are "sort of involved with the project," according to Jerk-Yard owner David Clausell. The two parties came to a partnership deal, he said.

"We kind of came together and rebranded it," Clausell told the RoundTable.

The Jerk-Yard grand opening will feature a limited menu that showcases some of chef Wesley Omar Johnson's best work, Clausell said. The new restaurant will be open from 2 to 10 p.m. Sunday, with a ribbon cutting and live DJ starting at 2.



EXHIBIT

M



Jerk-Yard, a small but growing chain of sports-bar style restaurants, will operate in the space previously held by Good to Go Jamaican. Credit: Alex Harrison

He also said there will be some "really good deals."

## New at Jerk-Yard

Clausell made some updates to the previous Good to Go space, making Jerk-Yard a bit more sporty. The restaurant holds big television screens for fans to watch games, a 120-inch projector screen, updated lighting, sound and restrooms.

"It also helped that me and my father were handymen," Clausell said, "We got in there and painted and, you know, put the TVs up. We didn't really have to do any structural work."

They did have to replace some kitchen items and work to get the smell of smoke out of the kitchen.

He describes the space now as an "upscale jerk restaurant with sports."



The patio at Jerk-Yard. Credit: Alex Harrison

Wesley Omar Johnson, or "Chef Wes," as Clausell calls him, is the man behind the new menu Jerk-Yard will offer. He brought things like curry goat and red snapper to the restaurant.

By the numbers, customers at Jerk-Yard's Hyde Park and South Loop Chicago locations love the Rasta pasta, a jerk-seasoned noodle dish that Jerk-Yard serves with salmon, pot roast, chicken or vegan.

"The Rasta pasta is the star of the show," Clausell said. This one dish actually doesn't come from Chef Wes — Clausell's sister came up with the recipe.

## 3 spots in a year

The Evanston location is the third Clausell has opened in a year. "Three in one year is kind of crazy, but it's happening," he said.

Besides the Chicago locations, Clausell said he has more opportunities to expand.

"We actually got a few offers out of town," he said. "In Scottsdale, Arizona, they want us to come there — and in Houston, they want us to come to Houston. So we're going to be going on a plane soon to go look at these locations out there."

## New life

Clausell is helping to give a new life to the space previously owned by husband and wife Tony and Lenice Levy. He told the RoundTable that a friend told him about their situation, and he got in contact with them to work out a new venture.

Before the fire in December, the Levys had operated Good to Go since 2018. Prior to the Evanston location, the duo ran a smaller, fast-service restaurant under the same name on the Chicago side of Howard.

The owners of Good to Go sought city assistance after the fire, but the Evanston Economic Development Committee denied the request, citing precedent and appropriate use of city loans.

Jerk-Yard regular hours will be 11 a.m. to 10 p.m. Tuesday to Thursday and 11 a.m. to 1 a.m. Friday and Saturday. Closed on Mondays.

© 2025 Evanston RoundTable Media NFP
Powered by Newspack

# Notice of Tax Lien



STATE OF
**Illinois**
DEPARTMENT OF REVENUE
tax.illinois.gov

May 30, 2024

GOOD TO GO JAMAICAN CUISINE LLC
2006 BRUMMEL ST
EVANSTON IL 60202-3806

| | |
|---|---|
| County Name: | Cook |
| Lien ID: | 215607 |
| Tax Types: | IL Withholding Income Tax |
| | Sales/Use Tax & E911 Surcharge |

We have issued this tax lien in accordance with the various tax acts administered by the Illinois Department of Revenue and the Illinois Compiled Statutes.

The debtor named on this notice owes the State of Illinois the following amount including penalty and interest:

### $369,669.35

Each debt that is included in this total is listed on the following page. The total amount shown, plus any interest and applicable penalties and fees that accrue, is a lien in favor of the Illinois Department of Revenue on all real and personal property that is currently owned or hereafter acquired by the taxpayer named on this notice. This tax lien will remain until the debt is paid.

David Harris, Director
ILLINOIS DEPARTMENT OF REVENUE

LIEN UNIT
ILLINOIS DEPARTMENT OF REVENUE
PO BOX 19035
SPRINGFIELD IL 62794-9035

217 785-5299
217 785-2635 fax



EXHIBIT

_N_

IDOR-64 N-MTI (R-1/18)

Lien ID:  215607                          May 30, 2024                          Details Page: 1

Listed below are the tax types and identifying numbers that make up the total tax, penalty, and interest due on this notice of tax lien.

| Tax Type: | Reporting Period: | Bill Item #: | NPL/1002D/TOA |
|---|---|---|---|
| IL Withholding Income Tax | March 31, 2024 | 1 | |
| Sales/Use Tax & E911 Surcharge | December 31, 2020 | 1 | |
| Sales/Use Tax & E911 Surcharge | January 31, 2021 | 1 | |
| Sales/Use Tax & E911 Surcharge | February 28, 2021 | 1 | |
| Sales/Use Tax & E911 Surcharge | March 31, 2021 | 1 | |
| Sales/Use Tax & E911 Surcharge | April 30, 2021 | 1 | |
| Sales/Use Tax & E911 Surcharge | May 31, 2021 | 1 | |
| Sales/Use Tax & E911 Surcharge | June 30, 2021 | 1 | |
| Sales/Use Tax & E911 Surcharge | July 31, 2021 | 1 | |
| Sales/Use Tax & E911 Surcharge | August 31, 2021 | 1 | |
| Sales/Use Tax & E911 Surcharge | September 30, 2021 | 1 | |
| Sales/Use Tax & E911 Surcharge | October 31, 2021 | 1 | |
| Sales/Use Tax & E911 Surcharge | November 30, 2021 | 1 | |
| Sales/Use Tax & E911 Surcharge | December 31, 2021 | 1 | |
| Sales/Use Tax & E911 Surcharge | January 31, 2022 | 1 | |
| Sales/Use Tax & E911 Surcharge | February 28, 2022 | 1 | |
| Sales/Use Tax & E911 Surcharge | March 31, 2022 | 1 | |
| Sales/Use Tax & E911 Surcharge | April 30, 2022 | 1 | |
| Sales/Use Tax & E911 Surcharge | May 31, 2022 | 1 | |
| Sales/Use Tax & E911 Surcharge | June 30, 2022 | 1 | |
| Sales/Use Tax & E911 Surcharge | July 31, 2022 | 1 | |
| Sales/Use Tax & E911 Surcharge | August 31, 2022 | 1 | |
| Sales/Use Tax & E911 Surcharge | September 30, 2022 | 1 | |
| Sales/Use Tax & E911 Surcharge | October 31, 2022 | 1 | |
| Sales/Use Tax & E911 Surcharge | November 30, 2022 | 1 | |
| Sales/Use Tax & E911 Surcharge | December 31, 2022 | 1 | |
| Sales/Use Tax & E911 Surcharge | January 31, 2023 | 1 | |
| Sales/Use Tax & E911 Surcharge | February 28, 2023 | 1 | |
| Sales/Use Tax & E911 Surcharge | March 31, 2023 | 1 | |
| Sales/Use Tax & E911 Surcharge | April 30, 2023 | 1 | |
| Sales/Use Tax & E911 Surcharge | May 31, 2023 | 1 | |
| Sales/Use Tax & E911 Surcharge | June 30, 2023 | 1 | |
| Sales/Use Tax & E911 Surcharge | July 31, 2023 | 1 | |
| Sales/Use Tax & E911 Surcharge | August 31, 2023 | 1 | |
| Sales/Use Tax & E911 Surcharge | September 30, 2023 | 1 | |
| Sales/Use Tax & E911 Surcharge | October 31, 2023 | 1 | |
| Sales/Use Tax & E911 Surcharge | November 30, 2023 | 1 | |

Lien ID:  215607

May 30, 2024



**GIT** 4W2698873

**CHICAGO TITLE INSURANCE COMPANY**
**WARRANTY DEED**
**ILLINOIS STATUTORY**
**JOINT TENANTS**

Doc#. 1627347014 Fee: $50.00
Karen A. Yarbrough
Cook County Recorder of Deeds
Date: 09/29/2016 08:44 AM Pg: 1 of 2

Dec ID 20160901662371
ST/CO Stamp 2-054-711-104 ST Tax $148.00 CO Tax $74.00

THE GRANTOR, NOEL STEWART-BANKS, of the City of Evanston, County of Cook, State of Illinois for and in consideration of TEN & 00/100 DOLLARS, and other good and valuable consideration in hand paid, Convey(s) and Warrant(s) to SHELTON ASHLEY, LENICE LEVY and DENNIS A. LEVY, not as tenants in common, but as joint tenants,

(GRANTEE'S ADDRESS) 425 DODGE AVENUE, EVANSTON, ILLINOIS 60202
of the County of Cook, all interest in the following described Real Estate situated in the County of Cook in the State of Illinois, to wit:

THE PART OF LOT 17 TO 25 BOTH INCLUSIVE (EXCEPT THE WEST 7 FEET FOR WIDENING DODGE AVENUE) IN BLOCK 3 IN M. L. JACKSON'S ADDITION TO SOUTH EVANSTON, BEING A SUBDIVISION OF THE NORTH 1/2 OF THE NORTHWEST 1/4 OF THE NORTHWEST 1/4 OF SECTION 25 TOWNSHIP 41 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT A POINT ON THE EAST LINE OF DODGE AVENUE AS WIDENED 272.13 FEET NORTH OF INTERSECTION OF SAID EAST LINE OF DODGE AVENUE WITH THE NORTH LINE OF KIRK STREET, THENCE EAST ON A LINE DRAWN AT RIGHT ANGLES TO SAY THIS LINE OF DODGE AVENUE 164.48 FEET TO A POINT ON THE EAST LINE 1 SAID LOTS 17 TO 25, 266.21 FEET NORTH OF SOUTHEAST CORNER THEREOF, THENCE NORTH ON NORTHEAST LINE OF SAID LOTS 17 TO 25, 21.83 FEET; THENCE WEST ON A LINE DRAWN 164.47 FEET TO THE EAST LINE OF DODGE AVENUE; THENCE SOUTH ON EAST SIDE OF DODGE AVENUE 21.83 FEET TO THE POINT OF BEGINNING IN COOK COUNTY ILLINOIS

SUBJECT TO: covenants, conditions and restrictions of record

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois. TO HAVE AND TO HOLD said premises not as tenants in common, but as joint tenants forever.

Permanent Real Estate Index Number(s): 10-25-200-036-0000
Address(es) of Real Estate: 425 Dodge Avenue, Evanston, Illinois 60202

Dated this _____ day of September, 2016.

_____
NOEL STEWART-BANKS (Seal)

_____
(Seal)

_____
(Seal)

_____
(Seal)

EXHIBIT

STATE OF ILLINOIS   COUNTY OF COOK                    SS.

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, CERTIFY THAT, NOEL STEWART-BANKS, personally known to me to be the same person whose name are subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that they signed, sealed and delivered the said instrument as their free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and official seal, this _____ 8th _____ day of September, 2016.

_____ (Notary Public)

---

Prepared By:          Walton Davis, Jr. Esq
                      2026 West 95th Street
                      Chicago, Illinois 60643

---

Mail To:
~~SHELTON ASHLEY, LENICE LEVY and DENNIS A. LEVY~~
~~425 Dodge Avenue~~
~~Evanston, Illinois 60202~~

(162412)
Hynes & Blau, PC
1411 McHenry Rd, Ste 125
Buffalo Grove, IL 60089

Name & Address of Taxpayer:
SHELTON ASHLEY, LENICE LEVY and DENNIS A. LEVY
425 Dodge Avenue
Evanston, Illinois 60202

CITY OF EVANSTON   030838
*Real Estate Transfer Tax*
*City Clerk's Office*
PAID
09/07/2016 AMOUNT $ 740.00
Agent LB

| REAL ESTATE TRANSFER TAX | | 25-Sep-2016 |
|---|---|---|
| | COUNTY: | 74.00 |
| | ILLINOIS: | 148.00 |
| | TOTAL: | 222.00 |
| 10-25-200-036-0000 | 20160801850371 | 2-054-711-104 |

Prepared By: |
Aaron J. McLeod, Esq.
1510 E. 55ᵗʰ Street
Unit 15396
Chicago, IL 60615

|
|
After Recording Return To:|
DL YVEL Land Trust
c/o Shelton Ashley
2017 Howard Street
Chicago, Illinois 60645

|
|



Doc# 2419908044 Fee $88.00

ILRHSP FEE:$18.00 RPRF FEE:$1.00
CEDRIC GILES
COOK COUNTY CLERK'S OFFICE
DATE: 7/17/2024 2:14 PM
PAGE: 1 OF 4

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## QUITCLAIM DEED

On February  28, 2024 THE GRANTOR(S),

CITY OF EVANSTON
**EXEMPTION**

-      Dennis Levy, a married man

for and in consideration of: One Dollar ($1.00) and/or other good and valuable consideration
conveys, releases and quitclaims to the GRANTEE(S):

-      DL YVEL Land Trust, Shelton Ashley, Trustee, residing at 120 Elwood Evanston, Cook
County, Illinois 60602

the following described real estate, situated in 425 Dodge Avenue, Evanston, in the County of
Cook, State of Illinois 60202

Legal Description:

THE PART OF LOT 17 TO 25 BOTH INCLUSIVE (EXCEPT THE WEST 7 FEET FOR
WIDENING DODGE AVENUE) IN BLOCK 3 IN M.L. JACKSON'S ADDITION TO SOUTH
EVANSTON, BEING A SUBDIVISION OF THE NORTH 1/2 OF THE NORTHWEST 1/4 OF
THE NORTHEAST 1/4 OF SECTION 25, TOWNSHIP 41 NORTH, RANGE 13, EAST OF
THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT A
POINT ON THE EAST LINE OF DODGE AVENUE AS WIDENED 272.13 FEET NORTH
OF INTERSECTION OF SAID EAST LINE OF DODGE AVENUE WITH THE NORTH LINE
OF KIRK STEET; THENCE EAST ON A LINE DRAWN AT RIGHT ANGLES TO SAY
THIS LINE OF DODGE AVENUE 164.48 FEET TO A POINT ON THE EAST LINE SAID

LOTS 17 TO 25, 266.21 FEET NORTH OF SOUTHEAST LINE OF SAID LOTS 17 TO 25, 21.83 FEET; THENCE WEST ON A LINE DRAWN 164.47 FEET TO THE EAST LINE OF DODGE AVENUE, THENCE SOUTH ON EAST SIDE OF DODGE AVENUE 21.83 FEET TO THE POINT OF BEGINNNG, IN COOK COUNTY, ILLINOIS.

Grantor does hereby convey, release and quitclaim all of the Grantor's rights, title, and interest in and to the above described property and premises to the Grantee(s), and to the Grantee(s) heirs and assigns forever, so that neither Grantor(s) nor Grantor's heirs, legal representatives or assigns shall have, claim or demand any right or title to the property, premises, or appurtenances, or any part thereof.

Grantor hereby releases and waives all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Tax Parcel Number: 10-25-200-036-0000

Exempt under Real Estate Transfer Tax Law 35 ILCS 200/31-45 sub par. ___ E ___ and Cook County Ord. 93-0-27 par/

Date _2/26/24_  Sign: _____

Mail Tax Statements To:
Lenice Levy
2017 Howard Street
Chicago, Illinois 60645

[SIGNATURE PAGE FOLLOWS]

REAL ESTATE TRANSFER TAX

| | 17-Jul-2024 |
|---|---|
| COUNTY: | 0.00 |
| ILLINOIS: | 0.00 |
| TOTAL: | 0.00 |

10-25-200-036-0000  | 20240701604010 | 1-529-010-992

**Grantor Signatures:**

DATED: _____

_____
Dennis Levy
2017 Howard Street
Chicago, Illinois 60645

STATE OF ILLINOIS, COUNTY OF COOK, ss:

This instrument was acknowledged before me on this _____ day of _____,
_____ by Dennis Levy.

_____
Notary Public

_____
Title (and Rank)

My commission expires _____

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantee shown on the deed assignment of beneficial interest in land trust is either a natural person, an Illinois corporation or a foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated _____      Signature: _____
                                      Grantor or Agent

Subscribed and sworn to before
Me by the said
this _____ day of _____
20____

NOTARY PUBLIC _____

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 983846
My Commission Expires December 19, 2027

The Grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois a partnership authorized to do business or entity recognized as a person and authorized to do business or acquire and hold title to real estate under the laws of the State of Illinois.

Date _____      Signature: _____
                                     Grantee or Agent

Subscribed and sworn to before
Me by the said
This _____ day of _____
20____

NOTARY PUBLIC _____

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 983846
My Commission Expires December 19, 2027

NOTE: Any person who knowingly submits a false statement concerning the identity of grantee shall be guilty of a Class C misdemeanor for the first offense and of a Class A misdemeanor for subsequent offenses. (Attach to deed or ABI to be recorded in Cook County, Illinois if exempt under provisions of Section 4 of the Illinois Real Estate Transfer Tax Act.)

Prepared By: |
Aaron J. McLeod, Esq.
1510 E. 55th Street
Unit 15396
Chicago, IL 60615

Doc# 2522507031 Fee $88.00
ILRHSP FEE:$18.00 RPRF FEE:$1.00
Monica Gordon
Cook County Clerk's Office
Date: 8/14/2025 11:30 AM
PAGE: 1 of 5

After Recording Return To:|
SHEKINAH LIGHT EVANSTON DODGE LAND TRUST
c/o Shelton Ashley, Trustee
2017 Howard Street
Chicago, Illinois 60645

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## QUITCLAIM DEED

On February  28, 2025 THE GRANTOR(S),

-    SHELLTON ASHLEY, Trustee of DL YVEL LAND TRUST

for and in consideration of: One Dollar ($1.00) and/or other good and valuable consideration
conveys, releases and quitclaims to the GRANTEE(S):

-    SHEKINAH LIGHT EVANSTON DODGE LAND TRUST, Shelton Ashley, Trustee,
located at 2017 Howard Street Chicago, Cook County, Illinois 60645

the following described real estate, situated in 425 Dodge Avenue, Evanston, in the County of
Cook, State of Illinois 60202

Legal Description:

THE PART OF LOT 17 TO 25 BOTH INCLUSIVE (EXCEPT THE WEST 7 FEET FOR
WIDENING DODGE AVENUE) IN BLOCK 3 IN M.L. JACKSON'S ADDITION TO SOUTH
EVANSTON, BEING A SUBDIVISION OF THE NORTH 1/2 OF THE NORTHWEST 1/4 OF
THE NORTHEAST 1/4 OF SECTION 25, TOWNSHIP 41 NORTH, RANGE 13, EAST OF
THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT A
POINT ON THE EAST LINE OF DODGE AVENUE AS WIDENED 272.13 FEET NORTH
OF INTERSECTION OF SAID EAST LINE OF DODGE AVENUE WITH THE NORTH LINE
OF KIRK STEET; THENCE EAST ON A LINE DRAWN AT RIGHT ANGLES TO SAY
THIS LINE OF DODGE AVENUE 164.48 FEET TO A POINT ON THE EAST LINE SAID

LOTS 17 TO 25, 266.21 FEET NORTH OF SOUTHEAST LINE OF SAID LOTS 17 TO 25,
21.83 FEET; THENCE WEST ON A LINE DRAWN 164.47 FEET TO THE EAST LINE OF
DODGE AVENUE, THENCE SOUTH ON EAST SIDE OF DODGE AVENUE 21.83 FEET
TO THE POINT OF BEGINNNG, IN COOK COUNTY, ILLINOIS.

Grantor does hereby convey, release and quitclaim all of the Grantor's rights, title, and interest in
and to the above described property and premises to the Grantee(s), and to the Grantee(s) heirs
and assigns forever, so that neither Grantor(s) nor Grantor's heirs, legal representatives or assigns
shall have, claim or demand any right or title to the property, premises, or appurtenances, or any
part thereof.

Grantor hereby releases and waives all rights under and by virtue of the Homestead Exemption
Laws of the State of Illinois.

Tax Parcel Number: 10-25-200-036-0000

Exempt under Real Estate Transfer Tax Law 35 ILCS 200/31-45 sub par. ___E___ and Cook County Ord.
93-0-27 par. H
Date 2/28/25      Sign. _____

Mail Tax Statements To:
Shelton Ashley, Trustee
2017 Howard Street
Chicago, Illinois 60645

[SIGNATURE PAGE FOLLOWS]

| REAL ESTATE TRANSFER TAX | | 14-Aug-2025 |
|---|---|---|
| | COUNTY: | 0.00 |
| | ILLINOIS: | 0.00 |
| | TOTAL: | 0.00 |
| 10-25-200-036-0000 | 20250601665329 | 0-184-586-864 |

**Grantor Signatures:**

DATED:

SHELTON ASHLEY, Trustee DLVEL LAND TRUST
2017 Howard Street
Chicago, Illinois 60645

STATE OF ILLINOIS, COUNTY OF COOK, ss:

This instrument was acknowledged before me on this _____ day of _____, 2025 by
SHELTON ASHLEY.

OFFICIAL SEAL
AARON JERMAINE MCLECO
Notary Public, State of Illinois
Commission No. 983848
My Commission Expires December 19, 2027

Notary Public

_____
Title (and Rank)

My commission expires _____

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantee shown on the deed assignment of beneficial interest in land trust is either a natural person, an Illinois corporation or a foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated _2/28/25_                          Signature: _____
                                                    Grantor or Agent

Subscribed and sworn to before
Me by the said _____
this ___ day of _Pebmen_
2025.

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 983846
My Commission Expires December 19, 2027

NOTARY PUBLIC

The Grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois a partnership authorized to do business or entity recognized as a person and authorized to do business or acquire and hold title to real estate under the laws of the State of Illinois.

Date _2/28/25_                           Signature: _____
                                                    Grantee or Agent

Subscribed and sworn to before
Me by the said
This ___ day of _Pebruey_
2025.

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 983846
My Commission Expires December 19, 2027

NOTARY PUBLIC

NOTE: Any person who knowingly submits a false statement concerning the identity of grantee shall be guilty of a Class C misdemeanor for the first offense and of a Class A misdemeanor for subsequent offenses. (Attach to deed or ABI to be recorded in Cook County, Illinois if exempt under provisions of Section 4 of the Illinois Real Estate Transfer Tax Act.)



# City of Evanston

## ELECTRONIC EXEMPTION STAMP
### Real Estate Stamp No: EXEMPT

Address: 425 Dodge Avenue, Evanston, L 60202

Pin(s): 10-25-200-036-0000

Exemption Fee: $100.00

Payment Date: 08/12/2025

Agent: TO

The above mentioned property has complied with the City of Evanston City Code, Title 3, Chapter 25, Section 2.

Please include this transfer stamp with your documentation to file with the Cook County Recorder of Deeds Office.

**City of Evanston - City Collector's Office**
909 Davis Street, 1st Floor
Evanston, IL 60201-2798
Phone: 847.448.4311

4/16/2003 9:39 AM FROM: Fax TO: 1-847-543-8522 PAGE: 001 OF 003



## QUIT CLAIM DEED
### Joint Tenancy (Illinois)

Mail to:
DENNIS LEVY
2006 BRUMMEL
EVANSTON, IL 60202

Name & address of taxpayer:
DENNIS LEVY
2006 BRUMMEL
EVANSTON, IL 60202

0311550625
Eugene "Gene" Moore  Fee: $26.50
Cook County Recorder of Deeds
Date: 04/25/2003 10:02 AM Pg: 1 of 3

THE GRANTOR(S) DENNIS LEVY, MARRIED TO LENICE LEVY
of the CITY of EVANSTON County of COOK State of ILLINOIS for and in consideration of TEN and NO/100ths
DOLLARS and other good and valuable considerations in hand paid.

CONVEYS AND QUIT CLAIMS to DENNIS LEVY AND LENICE LEVY, HIS WIFE  of the CITY of EVANSTON
State of ILLINOIS all interest in the following described real estate situated in the County of COOK , in the State of
Illinois, to wit:

LOT 18 IN BLOCK 1 OF WEST HAYDEN BELL'S HOWARD DODGE SUBDIVISION OF THE SOUTH 1/2 OF THE
SOUTHEAST 1/4 OF THE NORTHWEST 1/4 (EXCEPT THE SOUTH 2.5722 CHAINS THEREOF) IN SECTION 25, TOWNSHIP
41 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS

22442-CC  SKOKIE

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois. TO
HAVE AND TO HOLD said premises not as tenancy in common, but in joint tenancy forever.

Permanent index number(s) 10-25-111-005
Property address: 2006 BRUMMEL, EVANSTON, IL 60202
DATED this 16TH day of APRIL., 2003.

CITY OF EVANSTON
EXEMPTION

CITY CLERK

DENNIS LEVY



EXHIBIT
P

4/16/2003 9:29 AM  FROM: Fax   TO: 1-847-583-8527   PAGE: 001 OF 001

## QUIT CLAIM DEED
## Joint Tenancy (Illinois)

State of Illinois, County of COOK ss. I, the undersigned, a Notary Public in and for said County, in the State aforesaid,
DO HEREBY CERTIFY that DENNIS LEVY

personally known to me to be the same person(s) whose name(s) is/are subscribed
to the foregoing instrument, appeared before me this day in person, and the
person(s) acknowledged that the person(s) signed, sealed and delivered the
instrument as their free and voluntary act, for the uses and purposes therein set
forth

Given under my hand and official seal this 16TH day of APRIL, 2003.

Commission expires 0 3 , 2 / - 0 y

COUNTY- ILLINOIS TRANSFER STAMPS
EXEMPT UNDER PROVISIONS OF PARAGRAPH E SECTION 4, REAL ESTATE TRANSFER ACT.
DATE: 04/16/03
Buyer, Seller, or Representative:

Recorder's Office Box No.

THIS INSTRUMENT PREPARED AT THE DIRECTION OF AND NOT IN REPRESENTATION OF THE
PARTIES NAMED HEREIN

NAME AND ADDRESS OF PREPARER:

SHARON ROOS KIRKPATRICK,
Attorney at Law
9933 LAWLER AVE
SKOKIE, IL 60077

SKOKIE OFFICE
COOK COUNTY
RECORDER
EUGENE "GENE" MOORE

## STATEMENT BY GRANTOR AND GRANTEE
(55 ILCS 5/3 5020 B)

The Grantor or his Agent affirms that, to the best of his knowledge, the name of the Grantee shown on the Deed or Assignment of Beneficial Interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated _April 24th_ , 2003

Signature: X _____

Grantor or Agent

Subscribed and sworn to before me
by the said
this 14 day of _April_ , 2003
Notary Public

_Michael P. Platino_

OFFICIAL SEAL
MICHAEL P PLATT
NOTARY PUBLIC, STATE OF ILL.
MY COMMISSION EXPIRES 08/25/05

The Grantee or his Agent affirms and verifies that the name of the Grantee shown on the Deed or Assignment of Beneficial Interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire and hold title to real estate under the laws of the State of Illinois.

Dated _April 24th_ , 2003

Signature: X _____

Grantee

Subscribed and sworn to before me
by the said
this 24 day of _April_ , 2003
Notary Public

_Michael P. Platino_

OFFICIAL SEAL
MICHAEL P PLATINO
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 08/25/05

NOTE:  Any person who knowingly submits a false statement concerning the identity of a Grantee shall be guilty of a Class C misdemeanor for the first offense and of a Class A misdemeanor for subsequent offenses.

(Attach to Deed or ABI to be recorded in Cook County, Illinois, if exempt under the provisions of Section 4 of the Illinois Real Estate Transfer Tax Act.)



# EUGENE "GENE" MOORE

RECORDER OF DEEDS / REGISTRAR OF TORRENS TITLES
COOK COUNTY, ILLINOIS

Prepared By: |
Aaron J. McLeod, Esq.
1510 E. 55th Street
Unit 15396
Chicago, IL 60615
|
|
**After Recording Return To:|**
DL YVEL Land Trust
c/o Shelton Ashley
2017 Howard Street |
Chicago, Illinois 60645       |
|
|



Doc# 2419988046 Fee $88.00
ILRHSP FEE:$18.00 RPRF FEE:$1.00
CEDRIC GILES
COOK COUNTY CLERK'S OFFICE
DATE: 7/17/2024 2:16 PM
PAGE:  1 OF 4

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# QUITCLAIM DEED

On February 28, 2024 THE GRANTOR(S),

CITY OF EVANSTON
**EXEMPTION**

- Lenice Levy, a married woman

for and in consideration of: One Dollar ($1.00) and/or other good and valuable consideration
conveys, releases and quitclaims to the GRANTEE(S):

- DL YVEL Land Trust, Shelton Ashley, Trustee, residing at 120 Elwood Evanston, Cook
County, Illinois 60602

the following described real estate, situated in 2006 Brummel Street, Evanston, in the County of
Cook, State of Illinois 60202

Legal Description:

LOT 18 IN BLOCK 1 IN WEST HAYDEN BELL'S HOWARD-DODGE SUBDIVISION OF
THE SOUTH 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHWEST 1/4 (EXCEPT THE
SOUTH 2.5722 CHAINS THEREOF) OF THE SECTION 25, TOWNSHIP 41 NORTH,
RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY,
ILLINOIS.

Grantor does hereby convey, release and quitclaim all of the Grantor's rights, title, and interest in
and to the above described property and premises to the Grantee(s), and to the Grantee(s) heirs
and assigns forever, so that neither Grantor(s) nor Grantor's heirs, legal representatives or assigns

shall have, claim or demand any right or title to the property, premises, or appurtenances, or any part thereof.

Grantor hereby releases and waives all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Tax Parcel Number: 10-25-111-005-0000

Exempt under Real Estate Transfer Tax Law 35 ILCS 200/31-45 sub par. _E_ and Cook County Ord. 93-0-27 par. ____

Date _2/23/24_ Sign. _____

Mail Tax Statements To:
DL YVEL Land Trust
c/o Shelton Ashley
2017 Howard Street
Chicago, Illinois 60645

[SIGNATURE PAGE FOLLOWS]

| REAL ESTATE TRANSFER TAX | | 17-Jul-2024 |
|---|---|---|
| | COUNTY: | 0.00 |
| | ILLINOIS: | 0.00 |
| | TOTAL: | 0.00 |
| 10-25-111-005-0000 | 20240701653866 | 0-630-888-752 |

**Grantor Signatures:**

DATED: 2/28/24

Lenice Levy
2017 Howard Street
Chicago, Illinois 60645

STATE OF ILLINOIS, COUNTY OF COOK, ss:

This instrument was acknowledged before me on this 28th day of February, 2024
by Lenice Levy.

Notary Public

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 002509
My Commission Expires December 19, 2027

Attorney at Law
Title (and Rank)

My commission expires 12/19/27

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantee shown on the deed assignment of beneficial interest in land trust is either a natural person, an Illinois corporation or a foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated ___2/28/01___                          Signature: _____
                                                          Grantor or Agent

Subscribed and sworn to before
Me by the said _____
this _____ day of _____
20_____

NOTARY PUBLIC

> OFFICIAL SEAL
> AARON JERMAINE MCLEOD
> Notary Public, State of Illinois
> Commission No. 843846
> My Commission Expires December 14, ...

The Grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois a partnership authorized to do business or entity recognized as a person and authorized to do business or acquire and hold title to real estate under the laws of the State of Illinois.

Date ___2/28/24___                           Signature: _____
                                                          Grantee or Agent

Subscribed and sworn to before
Me by the said _____
This _____ day of _____
20_____

NOTARY PUBLIC

> OFFICIAL SEAL
> AARON JERMAINE MCLEOD
> Notary Public, State of Illinois
> Commission No. 843846
> My Commission Expires December 18, 2027

NOTE: Any person who knowingly submits a false statement concerning the identity of grantee shall be guilty of a Class C misdemeanor for the first offense and of a Class A misdemeanor for subsequent offenses. (Attach to deed or ABI to be recorded in Cook County, Illinois if exempt under provisions of Section 4 of the Illinois Real Estate Transfer Tax Act.)

Prepared By: |
McLeod Legal Advisors, LLC.
1510 E. 55th Street
Unit 15396
Chicago, IL 60615
        |
        |
After Recording Return To:|
IMAGO DEI EVANSTON HS Land Trust
c/o Shelton Ashley, Trustee
2017 Howard Street   |
Chicago, Illinois 60645       |

        |
        |



Doc# 2522607030 Fee $88.00
ILRHSP FEE:$10.00 RPRF FEE:$1.00
Monica Gordon
Cook County Clerk's Office
Date: 8/14/2025 11:28 AM
PAGE:  1 of 5

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## QUITCLAIM DEED

On February 28, 2025 THE GRANTOR(S),

- Shelton Ashley, Trustee of DL YVEL LAND TRUST

for and in consideration of: One Dollar ($1.00) and/or other good and valuable consideration
conveys, releases and quitclaims to the GRANTEE(S):

- IMAGO DEI EVANSTON HS Land Trust, Shelton Ashley, Trustee, located at 2017
Howard Street Chicago, Cook County, Illinois 60645

the following described real estate, situated in 2006 Brummel Street, Evanston, in the County of
Cook, State of Illinois 60202

Legal Description:

LOT 18 IN BLOCK 1 IN WEST HAYDEN BELL'S HOWARD-DODGE SUBDIVISION OF
THE SOUTH 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHWEST 1/4 (EXCEPT THE
SOUTH 2.5722 CHAINS THEREOF) OF THE SECTION 25, TOWNSHIP 41 NORTH,
RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY,
ILLINOIS.

Grantor does hereby convey, release and quitclaim all of the Grantor's rights, title, and interest in
and to the above described property and premises to the Grantee(s), and to the Grantee(s) heirs
and assigns forever, so that neither Grantor(s) nor Grantor's heirs, legal representatives or assigns

shall have, claim or demand any right or title to the property, premises, or appurtenances, or any part thereof.

Grantor hereby releases and waives all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Tax Parcel Number: 10-25-111-005-0000

Exempt under Real Estate Transfer Tax Law 35 ILCS 200/31-45 sub par. ___E___ and Cook County Ord. 93-0-27 par.

Date _____   Sign. _____

Mail Tax Statements To:
IMAGO DEI EVANSTON HS Land Trust
c/o Shelton Ashley, Trustee
2017 Howard Street
Chicago, Illinois 60645

## [SIGNATURE PAGE FOLLOWS]

REAL ESTATE TRANSFER TAX

14-Aug-2025

| | |
|---|---|
| COUNTY: | 0.00 |
| ILLINOIS: | 0.00 |
| TOTAL: | 0.00 |

10-25-111-005-0000   20250801059310   0-501-387-868

**Grantor Signatures:**

DATED:

Shelton Ashley, Trustee DL VEL Land Trust
2017 Howard Street
Chicago, Illinois 60645

STATE OF ILLINOIS, COUNTY OF COOK, ss:

This instrument was acknowledged before me on this ____ day of _____ 2025 by Shelton Ashley.

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 983846
My Commission Expires December 19, 2027

_____
Notary Public

_____
Title (and Rank)

My commission expires _____

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantee shown on the deed assignment of beneficial interest in land trust is either a natural person, an Illinois corporation or a foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated 2/20/25                          Signature: _____
                                                   Grantor or Agent

Subscribed and sworn to before
Me by the said
this ____ day of February,
2025.

NOTARY PUBLIC

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 983846
My Commission Expires December 19, 2027

The Grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois a partnership authorized to do business or entity recognized as a person and authorized to do business or acquire and hold title to real estate under the laws of the State of Illinois.

Date 2/28/25                           Signature: _____
                                                   Grantee or Agent

Subscribed and sworn to before
Me by the said
This ____ day of February,
2025.

NOTARY PUBLIC

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 983846
My Commission Expires December 19, 2027

NOTE: Any person who knowingly submits a false statement concerning the identity of grantee shall be guilty of a Class C misdemeanor for the first offense and of a Class A misdemeanor for subsequent offenses. (Attach to deed or ABI to be recorded in Cook County, Illinois if exempt under provisions of Section 4 of the Illinois Real Estate Transfer Tax Act.)



# City of Evanston

## ELECTRONIC EXEMPTION STAMP
### Real Estate Stamp No: EXEMPT

Address: 2006 Brummel Street, Evanston, IL 60202

Pin(s): 10-25-111-005-0000

Exemption Fee: $100.00

Payment Date: 08/12/2025

Agent: TO

The above mentioned property has complied with the City of Evanston City Code, Title 3, Chapter 25, Section 2.

Please include this transfer stamp with your documentation to file with the Cook County Recorder of Deeds Office.

City of Evanston - City Collector's Office
909 Davis Street, 1st Floor
Evanston, IL 60201-2798
Phone: 847.448.4311

7.24861

1/2

**WARRANTY DEED**
**ILLINOIS STATUTORY**

Doc# 1729229067 Fee $44.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A. YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 10/19/2017 12:32 PM PG: 1 OF 4

THE GRANTOR(S)

### Patricia Sledge, a single woman

of the  City of Evanston, County of Cook, State of IL for and in consideration of $10.00 (Ten and 00/100) dollar(s), and other good and valuable consideration in hand paid, CONVEY(S) and WARRANT(S) to

D'
Lenice Levy, _____

of 2006 Brummel, Evanston, of the County of Cook, all interest in the following described Real Estate situated in the County of Cook in the State of Illinois, to wit:

See Exhibit "A" attached hereto and made a part hereof

Subject to covenants, conditions and restrictions of record and building lines and easements, if any, provided they do not interfere with the current use and enjoyment of the Real Estate; and general real estate taxes not due and payable at the time of Closing.

Hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Permanent Real Estate Index Number(s): 11-30-209-015-0000

Address(es) of Real Estate: 134 Callan Ave, Evanston, IL 60202

Dated this 30th day of August, 2017.

_Patricia Sledge_
Patricia Sledge

CITY OF EVANSTON   032122
_Real Estate Transfer Tax_
_City Clerk's Office_

PAID SEP 06 2017 AMOUNT $ 170.00
Agent LB



EXHIBIT
Q

STATE OF ILLINOIS, COUNTY OF _____COOK_____

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, CERTIFY THAT

_____PATRICIA SLEDGE_____

personally known to me to be the same person(s) whose name(s) are subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that they signed, sealed and delivered the said instrument as their free and voluntary act, for the uses and purposwes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and official seal, this _____30th_____ day of _____August_____, 20_17_.

_____ (Notary Public)

Prepared by:

Stephanie Michel
2935 Central Street, Suite A
Evanston, IL 60201

STEPHANIE S MICHEL
Official Seal
Notary Public – State of Illinois
My Commission Expires Jul 10, 2021

Mail to:

Norman Goldmeier, Esq.
5225 Old Orchard Road, Suite 50
Skokie, Illinois 60077

Name and Address of Taxpayer:

Lenice Levy
2006 Brummel
Evanston, IL 60202

## COOK COUNTY
## ECURDER OF DEEDS

EXHIBIT "A" TO WARRANTY DEED
LEGAL DESCRIPTION

Lot 37, in Howard Terminal Addition, being a subdivision in the Southwest Quarter of
the Northeast Quarter of Section 30, Township 41 North, Range 14, East of the Third
Principal Meridian, in Cook County, Illinois.

PIN: 11-30-209-015-0000

COMMON ADDRESS: 134 Callan Ave., Evanston, IL 60202

## COOK COUNTY
## RECORDER OF DEEDS

## REAL ESTATE TRANSFER TAX

05-Oct-2017

 

| | |
|---|---|
| COUNTY: | 171.00 |
| ILLINOIS: | 342.00 |
| TOTAL: | 513.00 |

11-30-209-015-0000    20170901620149    0-645-248-960

Prepared By: |
Aaron J. McLeod, Esq.
1510 E. 55th Street
Unit 15396
Chicago, IL 60615
|

After Recording Return To:|
DL YVEL Land Trust
c/o Shelton Ashley
2017 Howard Street   |
Chicago, Illinois 60645      |

|
|



Doc# 2419988045 Fee $88.00
ILRHSP FEE:$18.98 RPRF FEE:$1.00
CEDRIC GILES
COOK COUNTY CLERK'S OFFICE
DATE: 7/17/2024 2:15 PM
PAGE: 1 OF 4

_____

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## QUITCLAIM DEED

On February 12 2024 THE GRANTOR(S),

CITY OF EVANSTON
**EXEMPTION**

- Lenice Levy, a married woman

for and in consideration of: One Dollar ($1.00) and/or other good and valuable consideration
conveys, releases and quitclaims to the GRANTEE(S):

- DL YVEL Land Trust, Shelton Ashley, Trustee, residing at 120 Elwood Evanston, Cook
County, Illinois 60602

the following described real estate, situated in 134 Callan Avenue, Evanston, in the County of
Cook, State of Illinois 60202

Legal Description:

LOT 37 IN HOWARD TERMINAL ADDITION, BEING A SUBDIVISION IN THE
SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SECTION 30, TOWNSHIP 41 NORTH,
RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY,
ILLINOIS.

Grantor does hereby convey, release and quitclaim all of the Grantor's rights, title, and interest in
and to the above described property and premises to the Grantee(s), and to the Grantee(s) heirs
and assigns forever, so that neither Grantor(s) nor Grantor's heirs, legal representatives or assigns

shall have, claim or demand any right or title to the property, premises, or appurtenances, or any part thereof.

Grantor hereby releases and waives all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Tax Parcel Number: 11-30-209-015-0000

Exempt under Real Estate Transfer Tax Law 35 ILCS 200/31-45 sub par. ___E___ and Cook County Ord. 93-0-27 par.
Date _____ Sign. _____

Mail Tax Statements To:
DL YVEL Land Trust
c/o Shelton Ashley
2017 Howard Street
Chicago, Illinois 60645

## [SIGNATURE PAGE FOLLOWS]

| REAL ESTATE TRANSFER TAX | | 17-Jul-2024 |
|---|---|---|
| | COUNTY: | 0.00 |
| | ILLINOIS: | 0.00 |
| | TOTAL: | 0.00 |
| 11-30-209-015-0000 | 20240701853952 | 1-658-805-040 |

**Grantor Signatures:**

DATED:

Lenice Levy
2017 Howard Street
Chicago, Illinois 60645

STATE OF ILLINOIS, COUNTY OF COOK, ss:

This instrument was acknowledged before me on this ___ day of _____ ,2024
by Lenice Levy.

Notary Public

Title (and Rank)

My commission expires

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantee shown on the deed assignment of beneficial interest in land trust is either a natural person, an Illinois corporation or a foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated _____   Signature: _____
Grantor or Agent

Subscribed and sworn to before
Me by the said _____
this ____ day of _February_
20 ____

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 983849
My Commission Expires December 19, 2027

NOTARY PUBLIC _____

The Grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois a partnership authorized to do business or entity recognized as a person and authorized to do business or acquire and hold title to real estate under the laws of the State of Illinois.

Date _____   Signature: _____
Grantee or Agent

Subscribed and sworn to before
Me by the said _____
This ____ day of _February_
20 ____

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 983849
My Commission Expires December 19, 2027

NOTARY PUBLIC _____

NOTE: Any person who knowingly submits a false statement concerning the identity of grantee shall be guilty of a Class C misdemeanor for the first offense and of a Class A misdemeanor for subsequent offenses. (Attach to deed or ABI to be recorded in Cook County, Illinois if exempt under provisions of Section 4 of the Illinois Real Estate Transfer Tax Act.)

Prepared By: |
Aaron J. McLeod, Esq.
1510 E. 55th Street
Unit 15396
Chicago, IL 60615
|

Doc# 2522607029 Fee $88.00
ILRHSP FEE:$18.00 RPRF FEE:$1.00
Monica Sorden
Cook County Clerk's Office
Date: 8/14/2025 11:24 AM
PAGE: 1 of 6

After Recording Return To:|
AGAPE EVANSTON CALLAN 134 Land Trust
c/o Shelton Ashley, Trustee
2017 Howard Street   |
Chicago, Illinois 60645          |

          |
          |

---

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## QUITCLAIM DEED

On February 28, 2025 THE GRANTOR(S),

- Shelton Ashley, Trustee of **DL YVEL LAND TRUST**

for and in consideration of: One Dollar ($1.00) and/or other good and valuable consideration
conveys, releases and quitclaims to the GRANTEE(S):

- AGAPE EVANSTON CALLAN 134 Land Trust, Shelton Ashley, Trustee, located 2017
Howard Street Chicago, Cook County, Illinois 60645

the following described real estate, situated in 134 Callan Avenue, Evanston, in the County of
Cook, State of Illinois 60202

Legal Description:

LOT 37 IN HOWARD TERMINAL ADDITION, BEING A SUBDIVISION IN THE
SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SECTION 30, TOWNSHIP 41 NORTH,
RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY,
ILLINOIS.

Grantor does hereby convey, release and quitclaim all of the Grantor's rights, title, and interest in
and to the above described property and premises to the Grantee(s), and to the Grantee(s) heirs
and assigns forever, so that neither Grantor(s) nor Grantor's heirs, legal representatives or assigns

shall have, claim or demand any right or title to the property, premises, or appurtenances, or any part thereof.

Grantor hereby releases and waives all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Tax Parcel Number: 11-30-209-015-0000

Exempt under Real Estate Transfer Tax Law 35 ILCS 200/31-45 sub par. _____E_____ and Cook County Ord. 93-0-27 par.
Date __2/18/25__   Sign. _____

Mail Tax Statements To:
AGAPE EVANSTON CALLAN 134 Land Trust
c/o Shelton Ashley, Trustee
2017 Howard Street
Chicago, Illinois 60645

### [SIGNATURE PAGE FOLLOWS]

REAL ESTATE TRANSFER TAX                                14-Aug-2025

|  | | COUNTY: | 0.00 |
|  | | ILLINOIS: | 0.00 |
|  | | TOTAL: | 0.00 |

11-30-209-015-0000    20250801699326   0-011-244-144

**Grantor Signatures:**

DATED:

Shelton Ashley, Trustee
2017 Howard Street
Chicago, Illinois 60645

STATE OF ILLINOIS, COUNTY OF COOK, ss:

This instrument was acknowledged before me on this _____ day of _____ ,2025
by Shelton.

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 983846
My Commission Expires December 19, 2027

Notary Public

_____
Title (and Rank)

My commission expires _____

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantee shown on the deed assignment of beneficial interest in land trust is either a natural person, an Illinois corporation or a foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated _____      Signature: _____
                                                              Grantor or Agent

Subscribed and sworn to before
Me by the said
this _____ day of _____,
2025.

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 983846
My Commission Expires December 19, 2027

NOTARY PUBLIC

The Grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois a partnership authorized to do business or entity recognized as a person and authorized to do business or acquire and hold title to real estate under the laws of the State of Illinois.

Date _____      Signature: _____
                                                              Grantee or Agent

Subscribed and sworn to before
Me by the said
This _____ day of _____,
2025.

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 983846
My Commission Expires December 19, 2027

NOTARY PUBLIC

NOTE: Any person who knowingly submits a false statement concerning the identity of grantee shall be guilty of a Class C misdemeanor for the first offense and of a Class A misdemeanor for subsequent offenses. (Attach to deed or ABI to be recorded in Cook County, Illinois if exempt under provisions of Section 4 of the Illinois Real Estate Transfer Tax Act.)



# City of Evanston

## ELECTRONIC EXEMPTION STAMP

Real Estate Stamp No: EXEMPT

Address: 134 Callan Avenue, Evanston, IL 60202

Pin(s): 11-30-209-015-0000

Exemption Fee: $100.00

Payment Date: 08/18/2025

Agent: TO

The above mentioned property has complied with the City of Evanston City Code, Title 3, Chapter 25, Section 2.

Please include this transfer stamp with your documentation to file with the Cook County Recorder of Deeds Office.

City of Evanston - City Collector's Office
909 Davis Street, 1st Floor
Evanston, IL 60201-2798
Phone: 847.448.4311

Citywide Title Corporation
77 W Washington St. Ste 1805
Chicago, Illinois 60602

Doc# 2531614030 Fee $88.00

ILRHSP FEE:$18.00 RPRF FEE:$1.00
Monica Gordon
Cook County Clerk's Office
Date: 11/12/2025 11:34 AM
PAGE: 1 of 8

FILE # 781450 /2

X DEED

___ SUBORDINATION

___ POWER OF ATTORNEY

___ OTHER

REMARKS

| 11·30·209·015·0000 |
| --- |
| 134 Callan Avmue. |
| Evanston, Illinois 60202 |

THIS PAGE IS BEEN ADDED FOR THE PURPOSE OF AFFIXING RECORDING INFORMATION

781450   1 of 2

PREPARED BY:
AARON J. MCLEOD, ESQ.
1510 E. 55th STREET
UNIT #: 15396
CHICAGO, IL 60615

MAIL TAX BILL TO:
EGE DEMIREL
~~134 Callan Ave.~~ 6733 N. Greenview Ave
~~Evanston, IL 60202~~ Chicago, IL 60626

MAIL RECORDED DEED TO:
EGE DEMIREL
~~134 Callan Ave.~~ 6733 N. Greenview Ave
~~Evanston, IL 60202~~ Chicago, IL 60626

---

**WARRANTY DEED**

*THE GRANTOR(S)*                                    dated February 28, 2025

SHELTON ASHLEY, Trustee of AGAPE EVANSTON CALLAN 134 LAND TRUST, of the
City of Chicago, County of Cook of the State of Illinois for and in consideration of Ten ($10.00)
DOLLARS and other good and valuable consideration(s) in hand paid, CONVEY(s) and
Warrants(s) to Ege Demirel, a married man of the County of Cook and the State of Illinois, all
interest in the following described real estate situated in the County of Cook, in the State of
Illinois, and to wit:

~~LOT 37, IN HOWARD TERMINAL ADDITION, BEING A SUBDIVISION IN THE
SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 30, TOWNSHIP 41
NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY,
ILLINOIS.~~ See attached ℭ

ADDRESS: 134 Callan Ave. Evanston, IL 60202

Permanent Index Number(s): 11-30-209-015-0000
Hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws
of the State of Illinois.

TO HAVE AND TO HOLD the above-granted premises unto the parties of the second part
forever.

Dated this ___ day of _September_ 2025

SHELTON ASHLEY, AGAPE EVANSTON CALLAN 134 LAND TRUST

STATE OF ILLINOIS )
                        ) SS.
COUNTY OF COOK )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, CERTIFY THAT, SHELTON ASHLEY personally known to me be the same person(s) whose name(s) are subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that they signed, seal and delivered the instrument as a free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and notary seal, this 24 day of September 2025

Notary Public

My commission expires on _____

OFFICIAL SEAL
AARON JERMAINE MCLEOD
Notary Public, State of Illinois
Commission No. 983846
My Commission Expires December 19, 2027

EXEMPT UNDER PROVISIONS OF PARAGRAPH
_____ SECTION 4, REAL ESTATE TRANSFER ACT.

DATE: _____

_____
Signature of Buyer, Seller or Representative
s



# City of Evanston

## ELECTRONIC REAL ESTATE TRANSFER STAMP

Real Estate Stamp No: 1181-2025

Address: 134 Callan Ave. Evanston IL 60202

Pin(s): 11-30-208-015-0000

Transfer Tax Amount: $3,200.00

Payment Date: 09/24/2025

Agent: SO

The above mentioned property has complied with the City of Evanston City Code, Title 3, Chapter 25, Section 2.

Please include this transfer stamp with your documentation to file with the Cook County Recorder of Deeds Office.

City of Evanston - City Collector's Office
909 Davis Street, 1st Floor
Evanston, IL 60201-2798
Phone: 847.448.4311

781450

**PERMANENT INDEX NUMBER:**
11-30-209-015-0000

**LEGAL DESCRIPTION**

LOT 37, IN HOWARD TERMINAL ADDITION, BEING A SUBDIVISION IN THE
SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 30,
TOWNSHIP 41 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL
MERIDIAN, IN COOK COUNTY, ILLINOIS.

## REAL ESTATE TRANSFER TAX

07-Nov-2025




| | COUNTY: | 320.00 |
| | ILLINOIS: | 640.00 |
| | TOTAL: | 960.00 |

11-30-209-015-0000 | 20250901685984 | 1-252-452-720

An Appraisal Report of

709-711 W. Howard Street
Evanston, IL 60202

At the request of

Wintrust Financial Corporation, Village Bank & Trust,
And The U.S. Small Business Administration (SBA)

As of

August 27, 2024

Prepared by

Maloney Appraisal Company, Inc.

Prepared

August 28, 2024

1



**MALONEY APPRAISAL COMPANY, INC.**
*APPRAISERS AND CONSULTANTS*
2446 N. Clark Street
Chicago, Illinois 60614
773-281-6013

August 28, 2024

Adolfo Mendez
Real Estate Services
Wintrust Financial Corporation
9701 W. Higgins Road, Suite 400
Rosemont, IL 60018

RE:

Go To Go Jamaican Cuisine LLC
709-11 W. Howard Street,
Evanston, IL 60202
Invoice #43238

Dear Mr. Mendez,

As requested, we have appraised the property located at 709-711 W. Howard Street, Evanston, IL 60202.
Andrew M. Egizio has made a personal inspection of the site and the improvements that are the subject of
this report. Mark T. Saleh has not made a personal inspection of the subject of this report but has
reviewed this report and concurs with the value conclusion.

The purpose of the appraisal is to estimate the market value of the fee simple interest in the real estate
described herein. The client has requested an "as-is" value. The subject was inspected on August 27,
2024. The date of the "as-is" value is August 27, 2024. The client has also requested a 90-Day
Liquidation value. The 90-Day Liquidation value can be found in the addendum. The date of this report is
August 28, 2024.

The client is Wintrust Financial Corporation. The intended users are Wintrust Financial Corporation,
Village Bank and Trust, and the U.S. Small Business Administration (SBA). The appraisal will be used
for purposes of loan underwriting, asset management or asset disposition. It may not be distributed to or
relied upon by other persons or entities without written permission.

Our appraisal conforms to the 2024-25 Uniform Standards of Professional Appraisal Practice and
Standards of Professional Practice of the Appraisal Institute. The inspecting appraiser is competent to
complete this report as required by the Uniform Standards of Professional Appraisal Practice. The
appraisal also conforms to the standards of all governing entities overseeing Wintrust Financial
Corporation chartered banks including, but not limited to, the appraisal policies and procedures of
Wintrust Financial Corporation, the Federal Reserve Bank, and the regulations of the Office of the
Comptroller of the Currency, and federal law, including but not limited to the Financial Institutions
Reform, Recovery and Rehabilitation Act (FIRREA), as amended.

The subject property is located on the north side of Howard Street, two blocks east of Ridge Avenue, on the southern edge of the City of Evanston. Howard Street is the dividing line between Evanston and Chicago. Properties on the south side of Howard Street are located within Chicago city limits. Per Sidwell Maps, the subject has 50.00 feet of frontage on Howard Street. The site is 100.00 feet deep for a total site area of 5,000 square feet. There is a concrete parking pad at the rear of the site that currently houses the dumpsters. If these dumpsters are rearranged, there is room for a one car exterior parking space in this area.

The site is improved with a one- and part two-story bar/restaurant building. The building was originally constructed in 1965 according to online tax records. The owners purchased the subject 2/2017 for $215,000 and subsequently performed an extensive renovation. The subject is 100% occupied by the owner's bar/restaurant business, Good to Go Jamaican Cuisine and Event Space. Per field measurements taken at the time of inspection, the subject has a gross building area of 4,419 square feet. The building is built on a slab. The first floor of the building covers most of the lot and has 3,919 square feet or 87% of the total gross building area. The interior of the first floor is configured with a main bar area, dining space, two (2) restrooms, a stage area, and a commercial kitchen. There is also a small outdoor patio at the front of the site with additional seating. The second floor has 500 square feet and accounts for approximately 13% of the total gross building area. The second floor has an office, two storage areas and a large covered roofdeck area. The property is described in greater detail in Section III in the body of this report.

Restaurant properties have generally seen a negative trend in value over the past few years due to myriad factors including rising mortgage interest rates, rapidly increasing operating expenses, and changing consumer habits. Additionally, the subject is located in an area, on the very southern edge of the City of Evanston. The subject is not located in an entertainment district and commercial conformity is only average. Any prospective purchasers of restaurant buildings go through a "rent versus own" analysis. A significant amount of restaurant space has hit the market both for sale and for rent over the past three years. Rent levels approached their lowest levels in 20 years in many areas. This has driven many potential buyers to rent rather than own. Moreover, increasing labor costs and costs of goods sold have diminished margins. The owner of the subject property reported to the appraiser that her restaurant business is expected to gross approximately $1 million in 2024. Per a Profit and Loss statement provided for our review, the subject grossed $1,734,970 in 2023. Thus, the subject's gross sales are down expected to be down near 40% year over year.

The subject has some offsetting positive factors that will help it compete. First, at under 5,000 square feet, the subject is an attractive size that would appeal to many bar/restaurant users. Second, the subject is in close proximity to area residents with above-average disposable income level. Finally, the subject has a high-quality roofdeck that is a very attractive amenity.

The subject will appeal almost exclusively to owner-users looking to value in use rather than investor. Investors would be the primary source of purchasers only if there was a long-term lease in place. This is not the case. The subject is 100% owner occupied. Ultimately, the sales comparison approach was given sole weight in our final reconciliation. The income approach was competed at the client's request and given no weight.

A narrative appraisal report is attached to this letter, and value estimate must be read in conjunction with that report. Furthermore, the value indication expressed in this letter and anywhere else in the body of the report must be read in light of the specific assumptions and limiting conditions set forth in our report. The value reported is qualified by certain definitions, assumptions and limiting conditions, and certifications that are set forth in the attached report. Based on my analysis, the opinion of the market value of the subject property, as set forth, documented, and qualified in the attached report under market conditions prevailing on **August 27, 2024,** was:

> **The fee simple market value "as is"**
> **As of August 27, 2024, is:**
> Nine Hundred Ninety-Five Thousand Dollars
> **($995,000)**

Very truly yours,

Maloney Appraisal Company, Inc.

Andrew M. Egizio
Appraiser
IL Certified General Appraiser
553.003004, exp. 09/30/2025

Mark T. Saleh, MAI
Review Appraiser
IL Certified General Appraiser
553.002479, exp. 09/30/2025